**INDIANA CIVIL LIBERTIES UNION INC., et al., Plaintiffs,**

v.

**Frank O'BANNON, et al., Defendants.**

**No. IP00–0811–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 28, 2000.

843

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, for Plaintiffs.

Geoffrey Slaughter, Special Counsel to Attorney General of Indiana, Indianapolis, IN, for Defendant.

## ORDER GRANTING PRELIMINARY INJUNCTION

BARKER, Chief Judge.

Plaintiffs, Indiana Civil Liberties Union, Inc., et al. (collectively "ICLU"), move for a preliminary injunction seeking to prevent Defendants, Frank O'Bannon, et al. (collectively "Indiana" or "State"), from posting on the grounds of the Indiana Statehouse a monument containing, among other things, the Ten Commandments. For the reasons discussed below, we *GRANT* Plaintiffs' motion and preliminarily enjoin the State from proceeding to erect the proposed monument on the grounds of the Indiana Statehouse.

## Background

The parties have entered a Stipulation of Facts ("Stip.") from which the majority of the following facts are gleaned. To the extent that we rely on one of the parties' other submissions, we abbreviate them as follows: Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("ICLU Mem."); Defendants' Memorandum in Opposition to Motion for Preliminary Injunction ("Opp'n Mem."); and Plaintiffs' Reply Memorandum in Support of Motion for Preliminary Injunction ("ICLU Reply").

### A. The Statehouse Grounds

The Indiana Statehouse is prominently positioned in downtown Indianapolis consisting of, in addition to the Capitol Building itself, a sizeable expanse of land stretching from Washington Street on the south, between Capitol and Senate Avenues, to Ohio Street on the north. See Stip. ¶ 3. The Statehouse contains the office of the Governor, the Indiana General Assembly, the Indiana Supreme Court and the chambers of its justices, the Indiana Court of Appeals and the chambers of some of its judges, as well as the offices of certain other Indiana constitutional and statutory officeholders. See id. ¶ 2. Immediately to the north of Washington Street is a 1.93 acre plot of park-like land on the grounds of the Statehouse, immediately in front of the south entrance to the Statehouse. See id. ¶ 4.

On the park-like lawn area, there are presently located, among other things: monuments honoring the national road and coal miners, as well as statues of George Washington, Christopher Columbus, Vice President Thomas A. Hendricks, and Governor Oliver P. Morton; in addition there are a number of ornamental trees marked with placards honoring various former governors of Indiana. See Stip., Ex. 2 ("Map") (map of all of the monuments on the statehouse grounds including their photographs). The southwest area of the lawn contains currently only a single tree marked with a placard honoring former Governor Schricker and a four-feet tall by two-feet wide monument noting the historic significance of the National Road, U.S. 40, which formerly ran along Washington Street. See id. ¶ 5. The proposed monument ("Monument") containing a version of the Ten Commandments, the Preamble of the 1851 Indiana Constitution, and the Bill of Rights is intended to be placed on this southwest section of the lawn, near Senate avenue, though the precise spot has not been identified to us by the parties. See Stip. ¶ 28. The Monument as designed will be a four-sided structure, measuring approximately seven feet high at its highest point, six-feet, seven-inches wide at its widest point, more than four-feet deep, and will be composed of two large blocks of Indiana limestone weighing almost 11,500 pounds. See id. ¶¶ 7, 10.

It is intended that the Monument will be erected in the approximate location of a former monument containing the Ten Commandments that, in 1958, had been donated by the Fraternal Order of the Eagles ("FOE") in 1958. See id. ¶¶ 24, 28. The prior Ten Commandments monument was toppled in 1991 in a series of acts of vandalism. See Stip. ¶¶ 24, 26; Stip., Ex. 1 ("Press Release"). Its exact location, and which direction it will face, are yet to be determined; however, the State indicated at oral argument that the Monument will be placed as closely as possible to the site of the former Ten Commandments monument. See Stip. ¶¶ 24, 28. The site of the former monument is within the triangular portion of grass shown on the Map as containing the tree dedicated to former Governor Schricker, approximately one-hundred-thirteen-feet north of the north edge of the Washington Street sidewalk, approximately eighty-three-feet south of the middle of the east-west walkway that touches the south side of the Statehouse, and approximately nineteen-feet east of the Senate Avenue sidewalk. See id. ¶¶ 34, 35. The location is also approximately forty-one-feet away from Governor

Schricker's tree and ninety-two-feet away from the National Historic Civil Engineering Landmark. *See id.* ¶ 36. The monument honoring Christopher Columbus is approximately forty-three-feet north of the east-west sidewalk that touches the south side of the Statehouse. *See id.* ¶ 37. The State also represented at oral argument that the Monument will be at least fifteen-feet from any existing pathway and that no plans exist to create a path to it.

South of the Statehouse, five monuments and four dedicated trees currently stand; located west of the Statehouse are three monuments, one marker, and two dedicated trees. *See* Map.[1] To reiterate, only the Columbus statue, one of the National Road monuments, and a dedicated tree will be within ninety-two-feet of the proposed site of the Monument. *See* Stip. ¶¶ 35–37.

### B. The Monument

The proposed Monument is being donated by the Indiana Limestone Institute, after having been enlisted by State Representative Brent Steele of Lawrence County ("State Representative Steele"). *See* Stip. ¶¶ 21–22; Opp'n Mem. at 4 (citing Deposition of Brent Steele ("Steele Dep.") at 8–10).

The State's brief details the history of the 1958 monument, given as a gift to the State by the FOE. *See* Opp'n Mem. at 2–4; Stip. ¶ 25.[2] The original monument contained the text of the Ten Commandments on a seven-feet tall, three-feet wide, and one-foot deep center tablet that was flanked by two smaller tablets (each of which was three-feet by three-feet, eight-inches) listing Indiana FOE lodge affiliates. *See* Opp'n Mem. at 2–3. The origi-

nal monument was erected as part of a national campaign, initiated by a Minnesota juvenile court judge, as a way of addressing what he perceived to be a need for juveniles to have a "code of conduct," from which they could benefit by " 'exposure to one of mankind's earliest codes of conduct, the Ten Commandments.' " *See* Opp'n Mem. at 3 (quoting *Books v. City of Elkhart*, 79 F.Supp.2d 979, 982 (N.D.Ind. 1999), *appeal pending* and *State v. Freedom From Religion Found., Inc.*, 898 P.2d 1013, 1017 (Colo.1995)).[3] The FOE undertook a national campaign at or about this time in support of this program. *See id.*

In 1991, when the previous monument was vandalized, Indiana officials promised the public it would replace the monument. *See id.* at 3–4; Stip. ¶ 26. In 1996, Indiana officials renewed their promise to replace the FOE monument; however, in the interim the original monument had been repaired and relocated to the Eagles Lodge in Anderson, Indiana. *See* Steele Dep. at 7, 12. When plans were announced to construct a new Ten Commandments monument on Statehouse grounds, Representative Steele oversaw completion of the initial design in conjunction with the Indiana Limestone Institute. *See id.* at 6–9; Stip. ¶ 22. This design called for a more substantial monument, hopefully more impervious to vandalism, containing only a text of the Ten Commandments. *See* Opp'n Mem. at 4; ICLU Reply at 2. However, after being apprised of the ruling in *State v. Freedom From Religion Foundation, Inc.*, Representative Steele (who is an attorney) decided to add two other historical documents to the monument, namely, the Bill of Rights and the

---

1.  As the parties have provided a map of the Statehouse grounds and pictures of the monument, *see* Map, we will refer to those materials to the extent such reference is required rather than describing the monuments in detail herein.

2.  As we note elsewhere, we have reservations about the relevance of this information, but include it to provide a complete record.

3.  The constitutionality of an identical monument was at issue in the Northern District of Indiana in *Books,* as well as in *State v. Freedom From Religion Foundation, Inc.,* 898 P.2d 1013 (Colo.1995). The Government has cited facts from these two cases to supplement its presentation of historical facts here.

Preamble to the 1851 Indiana Constitution. *See* Steele Dep. at 5, 17, 27–34.[4]

The Monument as designed consists of two pieces, a base and an upper portion, weighing approximately 11,500 pounds total. *See* Stip. ¶ 7. The base is a rectangular block of limestone, six-feet, seven-inches wide, four-feet, seven-inches deep, and two-feet, eight-inches long. *See id.* ¶ 8. On top of the base will sit a four-sided block—tapered, with two large faces, each measuring four-feet, four-inches in height by three-feet, seven-inches in width, while the smaller faces will be triangular, also four-feet, four-inches tall, but tapering from a width of approximately two-feet, six-inches at the base to six-inches at the top. *See id.* ¶ 9.

The large surfaces on the top block will be tablet shaped, that is, the stones will be carved with two rounded arcs or arches at the top; (it is a form widely utilized in artistic depictions of the stone tablets delivered or handed down by Moses upon his return from Mt. Sinai). One of the surfaces will display the following text:

TEN ·COMMANDMENTS

I. THOU SHALT HAVE NO OTHER GODS BEFORE ME

II. THOU SHALT NOT MAKE UNTO THEE ANY GRAVEN IMAGE

III. THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN

IV. REMEMBER THE SABBATH DAY TO KEEP IT HOLY

V. HONOR THY FATHER AND THY MOTHER THAT THY DAYS MAY BE LONG IN THE LAND WHICH THE LORD THY GOD GIVETH THEE

VI. THOU SHALT NOT KILL

VII. THOU SHALT NOT COMMIT ADULTERY

VIII. THOU SHALT NOT STEAL

IX. THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR

X. THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE OR WIFE OR ANYTHING THAT IS THY NEIGHBOR'S.

*Id.* ¶¶ 9–11. The State represents that this text, which is allegedly similar to that appearing on the 1958 FOE-donated monument, will be set forth in all-capital letters approximately one-inch in height. *See id.* ¶ 13. This is the only text appearing on one side of the monument. *See id.* ¶ 12. The second large tablet-shaped face of the Monument will display the text of the Bill of Rights from the United States Constitution which is expected to be engraved all in capital letters each of an approximate height of five-eighths of an inch. *See id.* ¶¶ 14–16.

On one triangular face of the Monument will be the text of the Preamble to the 1851 Indiana Constitution—

To the end, that justice be established, public order maintained, and liberty perpetuated: We, the People of the State of Indiana, grateful to Almighty God for the free exercise of the right to choose our own form of government, do ordain this Constitution.

*Id.* ¶ 19. However, the source of this text is not expressly attributed to the Indiana Constitution. *See id.* The other triangular face will identify the Indiana Limestone industry as the donor of the monument with the historical explanation that "[t]his monument replaces one donated by the Aeries and Auxiliaries of the Indiana Fraternal Order of Eagles on October 25, 1958." *Id.* ¶ 17. We are not informed of the size of the lettering of these two passages, but the State expects it to be balanced in the context of the rest of the monument. *See id.* ¶¶ 18, 20.

---

**4.** The Press Release erroneously indicated that the monument would include the Preamble to the United States Constitution rather than the Preamble to the 1851 Indiana Constitution. *See* Press Release.

The purpose for erecting this monument was explained by Governor O'Bannon in a press release issued at the time he announced the State's acceptance of this gift. The Governor stated that the monument will be placed on the Statehouse lawn to remind people of "some of our nation's core values" and the juxtaposition of the Ten Commandments and the Indiana Constitution's preamble as well as the Bill of Rights will exemplify "ideals" that all people "need to be reminded of from time to time." Governor O'Bannon also stated in that press release that the Ten Commandments "[s]oon ... will stand alongside the abiding principles of our form of government, especially its protections of individual rights, ...," and "will be an integral part of the Statehouse setting, which honors the history of our state and our nation." The parties do not disagree that the new monument is also intended to honor the FOE for having donated the old monument in 1958 that contained the Ten Commandments and stood on the Statehouse lawn. See Stip. ¶ 17.

State Representative Steele, who co-authored Act 1180 authorizing the display of the Ten Commandments along with these other two documents, stated in the press release that the "new monument will soon take its proper place alongside such historic figures as Oliver P. Morton, Thomas A. Hendricks, George Washington, and Christopher Columbus." When questioned as to why he chose the Ten Commandments to display on the Statehouse grounds, as opposed to any other codes, such as the Code of Hammurabi and the Roman Code, Representative Steele responded, "[W]hy not these rules?" Steele Dep. at 39. Representative Steele shares Governor O'Bannon's view that the Ten Commandments remind us of the nation's core values and that the Ten Commandments and the other texts to be displayed on the Monument express common ideals. See Steele Dep. at 34, 36–37. Representative Steele has conceded that certain of the statements in

the Ten Commandments, such as the admonishments to not have other gods, keep the Sabbath holy, and not make graven images, in addition to expressing core values in our nation, are a form of religious expression. See id. at 36, 37.

### C. The Plaintiffs

For purposes of injunctive relief, Defendants do not challenge Plaintiffs' standing. The ICLU has among its membership employees of the State of Indiana who work in the State Office Building which is located immediately west of the proposed location of the monument. See Compl. The ICLU asserts that because of this proximity these individuals will be forced into frequent, direct, and unwelcome contact with the monument during the course of their normal routines, if it is erected as planned, and to alter those routines to avoid the monument would impose an undue burden. See id. Further, members of the ICLU as well as the individual plaintiffs allege that they travel regularly to the Statehouse to participate as citizens of Indiana in various capacities and for a variety of purposes. See id. Plaintiffs allege that they will be forced to come into direct and unwelcome contact with the monument, if it is erected as planned, and to avoid the monument would cause them an undue burden. See id. Finally, Plaintiffs allege that some of the ICLU's members, as well as individual plaintiffs, regularly travel on the road and sidewalks adjoining Washington Street, near where the monument is to be located which would force them to come into direct and unwelcome contact with the monument, if it is erected as planned, and again to avoid the monument would cause them an undue burden. See id.

### Discussion [5]

#### A. Preliminary Injunction Standard

In order to be entitled to a preliminary injunction, the moving party must demonstrate:

---

**5.** Although in its Answer the State has con-

tested Plaintiffs' standing to bring suit, it has

(1) some likelihood of prevailing on the merits, and (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied. If the movant clears these two thresholds, the court must consider (3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties.

*Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 63 F.3d 581, 585 (7th Cir.1995); *see also Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir.1987). The heart of this test is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir.1984). Defendants concede for the purposes of this motion that Plaintiffs lack an adequate remedy at law. *See* Opp'n Mem. at 14.

### 1. Likelihood of success on the merits: Establishment Clause standards [6]

■ Plaintiffs' first obligation is to establish some likelihood of success on the merits of its challenge to the Monument on First Amendment–Establishment Clause grounds. This is no small assignment, given the profusion and confusion reflected in the case law and in Supreme Court precedent. As Judge Sharp noted in his recent decision in *Books*, there are no fewer than five Supreme Court tests for determining when government action penetrates the wall between church and state. *See*

*Books*, 79 F.Supp.2d at 989 & n. 5. However, since both parties in the case at bar agree that the substantive law standards governing this case are those set out in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), we need not and will not engage in a full-scale analysis of each possible test. *See* ICLU Mem. at 4–6; Opp'n Mem. at 14–15. Our approach is validated by recent reaffirmations, by both the Supreme Court and the Seventh Circuit, of the continuing vitality of the *Lemon* standards. *See Agostini v. Felton*, 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 493 (7th Cir. 2000); *Bridenbaugh v. O'Bannon*, 185 F.3d 796, 797–98 (7th Cir.1999).[7]

■ Under *Lemon*, a governmental action is constitutional under the Establishment Clause if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster excessive governmental entanglement with religion. *See Lemon*, 403 U.S. at 611–12, 91 S.Ct. 2105. A governmental action "violates the Establishment Clause if it fails to satisfy *any* of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (emphasis added). Although the continuing vitality of the *Lemon* test has been debated among jurists and other legal scholars, the Supreme Court recently reaffirmed that "the general principles we use to evaluate whether government aid violates the Establishment Clause have not changed...." *Agostini*, 521 U.S. at 222–23, 117 S.Ct. 1997. Thus, Establishment Clause analysis continues to focus on

conceded standing for the purposes of this motion; thus, we do not address here the legal merits of that issue.

**6.** The ICLU has framed its challenge to the posting of the Ten Commandments in violation of the Establishment Clause, *not* to the constitutionality of Indiana Code § 4–20.5–21–2 which allows for the posting of the Ten Commandments. *See* ICLU Mem. at 4.

**7.** At oral argument, both parties conceded that the anticipated Seventh Circuit's decision reflecting its review of *Books*, which case was argued there in May of this year, will be highly informative on the issues the parties have presented to us, and perhaps, depending on the scope of that opinion, even dispositive of this matter.

"whether the government acted with the purpose of advancing or inhibiting religion ... [and] whether the [action] has the 'effect' of advancing or inhibiting religion [as well as whether the action involves an excessive entanglement with religion]." *Agostini,* 521 U.S. at 232, 117 S.Ct. 1997.

The general principles laid out in *Lemon,* have been redefined by the Supreme Court so that under current interpretations the first two factors are characterized or construed as an "endorsement" test. *See, e.g., Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). As the Seventh Circuit recently noted,

> [f]ollowing the Court's formal acceptance in *County of Allegheny* ..., the effect prong of [the *Lemon* ] test has been analyzed under the 'perception of endorsement' test developed in *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). Under this test, 'the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'

*City of Marshfield,* 203 F.3d at 493.

The ICLU concedes that the proposed Monument does not implicate the third prong of the *Lemon* test, that is, it does not promote "excessive entanglement" of the government with religion; thus we only consider whether the Monument has a secular purpose and whether the effect of the Monument is to advance or inhibit religion.

*a. Purpose for creating the Monument*

■ The general rule when attempting to determine the purpose behind a governmental action is to consult and to defer to the stated purpose for the action. *See Edwards,* 482 U.S. at 586–87, 107 S.Ct. 2573. While the secular purpose need not

be the exclusive purpose for taking the action, it must be sincere and not a sham to avoid a potential Establishment Clause violation. *See Bridenbaugh,* 185 F.3d at 800, 801 (citing *Lynch,* 465 U.S. at 681 n. 4, 104 S.Ct. 1355 and *Edwards,* 482 U.S. at 586–87, 107 S.Ct. 2573). Since the avowed purpose may not be a "sham," courts have looked at both the context of the display as well as the content of the display to determine if the purpose is in fact secular. *See County of Allegheny,* 492 U.S. at 597, 109 S.Ct. 3086.

In conducting this analysis, we, of course, examine first the applicable precedential law. In *Stone v. Graham,* the Supreme Court held that Kentucky legislation requiring the posting of the Ten Commandments in the back of every classroom in the commonwealth was unconstitutional because it had no valid secular purpose. 449 U.S. 39, 42–43, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). The displays recited in small print at the bottom the following: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41, 101 S.Ct. 192. The Supreme Court held that, despite this avowed purpose, the purpose was plainly religious in nature. *See id.* In reaching this conclusion, the Court relied on the fact that the Ten Commandments is "undeniably a sacred text in the Jewish and Christian faiths...." *Id.* The Court indicated that other governmental invocations of the Ten Commandments may pass constitutional muster, but the challenged action made no attempt to mitigate the religious nature of the Ten Commandments. *See id.* at 42, 101 S.Ct. 192 ("This is not ·a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.... Posting of religious texts on the wall serves no

such educational function.") (citation omitted).[8]

Likewise, in a trio of related cases, the Eastern District of Kentucky has recently held that the display of the Ten Commandments on public grounds had no secular purpose and was unconstitutional. *See Doe v. Harlan County Sch. Dist.*, 96 F.Supp.2d 667 (E.D.Ky.2000) (posting in public schools); *American Civil Liberties Union of Ky. v. McCreary County*, 96 F.Supp.2d 679 (E.D.Ky.2000) (posting in courthouse); *American Civil Liberties Union of Ky. v. Pulaski County*, 96 F.Supp.2d 691 (E.D.Ky.2000) (posting in courthouse). In these cases, the defendants claimed that the displays were intended to teach "American religious history and the foundations of the modern state." *McCreary County*, 96 F.Supp.2d at 686. However, the "narrow scope of the display[s]" belied this stated purpose. *See id.* at 686–87. Moreover, the history of the displays revealed that they originally contained only the Ten Commandments and that only in the face of litigation did the defendants attempted to flank the Commandments with other documents. *See id.* at 687. The Court stated that even if it were to consider these additional documents in construing the purpose of the display, the fact that each had been chosen for its religious references reinforced the court's conclusion that there was no secular purpose. *See id.*

In *Ring v. Grand Forks Public School District Number 1*, the District of North Dakota faced a similar challenge to legislative action requiring the posting of a placard containing the Ten Commandments in a conspicuous place in every classroom in the state. *See* 483 F.Supp. 272, 273 (D.N.D.1980). These defendants contended that the purpose of the requirement was to "instill in students the basic mores of civilization and the principles of our

common law." *Id.* at 274. However, the court held that the posting of the Ten Commandments without any explanation plainly failed to convey that message and thus had no secular purpose. *See id.*

In contrast to these holdings, the Northern District of Indiana recently determined that a monument on the municipal building lawn in the City of Elkhart, Indiana, which structure was identical to the one that formerly stood on the Indiana Statehouse lawn, had a secular purpose. *See Books*, 79 F.Supp.2d at 996. The District Court judge could glean almost no evidence as to the intent of the city in accepting the display of the Ten Commandments, so it looked to the purpose behind the donation of the monument. *See id.* at 996. Looking only at this stated purpose and referring to the factual findings of the Colorado Supreme Court in *State v. Freedom From Religion Foundation, Inc.*, 898 P.2d 1013 (Colo.1995), where the intent of an identical donor of an identical monument was construed, the District Judge in *Books* held that the purpose was to "promot[e] morality among [the city's] youth, ... a legitimate aim of government and traditionally part of the police powers of the state." *Books*, 79 F.Supp.2d at 996. In addition, the District Court noted that the donor, the Elkhart chapter of the FOE, was a service organization, not a religious organization. *See id.* at 982. Moreover, at the time of the litigation, the Elkhart Common Council had stated its intention "to maintain a number of exhibits on City property of cultural and historical significance, of which the Ten Commandments monument is just one." *Id.* at 996. Thus, in *Books*, the court concluded that the city had a secular purpose in originally accepting the monument and that its presently stated purpose in displaying it was also secular in nature. *See id.*

---

8. In fact, as we discuss below, Justice Stevens has noted that the south wall of the Supreme Court chambers contains a frieze that includes a depiction of Moses holding the Ten

Commandments that presents no constitutional violation. *See County of Allegheny*, 492 U.S. at 652–53, 109 S.Ct. 3086 (Stevens, J., concurring in part and dissenting in part).

In a similar fashion, the Western District of North Carolina held that a display of the Ten Commandments in conjunction with the image of Lady Justice, the sword of justice, and the scales of justice flanked by the United States and North Carolina flags had a secular purpose and was constitutional. *See Suhre v. Haywood County*, 55 F.Supp.2d 384, 399 (W.D.N.C.1999). The court looked to the history of the dedication of the monument and found that its intent was to "honor and respect the development of the judicial system." *Id.* at 394. Although the dedication ceremony included the admonition that "[t]his is your Temple of Justice.... Bear in mind at all times that you should be as fair in your dealings with each other as the blind Goddess who stands there, always guided by the Ten Commandments as your code of law ...," *id.* at 387, the court held that the purpose was secular in nature. *See id.* at 394.

▪ Turning to the case at bar, we start with the Supreme Court's declaration that the Ten Commandments is undeniably a sacred text. *See Stone*, 449 U.S. at 41, 101 S.Ct. 192.[9] With the unambiguous religious nature of the Ten Commandments as our starting point, the State is obligated to articulate a valid secular purpose for the display of this sacred text. *See Metzl v. Leininger*, 57 F.3d 618, 622 (7th Cir.1995). The State adopts the purpose articulated by the Governor in his Press Release an-

nouncing that the State will allow the Monument to be placed on the Statehouse lawn, which states that the Ten Commandments are to be displayed as a reminder of our nation's core values and ideals. *See* Press Release. Further, the purpose of the Monument is to "venerate[ ] important documents that reflect the history and ideals animating American government ... [and] add[ ] to the rich historical context presented to visitors to the State capitol." Opp'n Mem. at 15. Focusing on the documents other than the Ten Commandments contained on the Monument, the government argues that the content of the Monument is predominately secular. *See id.* at 16. "Most of the surface of the monument and most of the words on it relate to the Bill of Rights and Preamble to the 1851 Indiana Constitution." *Id.*

However, at oral argument, the State was unable to elucidate or cite any historical link between most of the commandments and "ideals animating American government." Counsel for the State, when asked about each individual commandment, was unable to provide any historical linkage between seven of the commandments and only weak historical links to three of them.[10]

The State directs us to the factual findings in *State v. Freedom From Religion Foundation* as indicative of the secular purpose inherent in a display posting the Ten Commandments. There, the stated

9. According to the ICLU, the sacred nature of this text stems from the belief that the Ten Commandments were given by God to Moses at Mount Sinai. *See* ICLU Mem. at 3. Moreover, many people see the Commandments not as individual statements, but instead as a whole—a single pronouncement held together by the initial commandment, "I am the Lord thy God." *See* ICLU Mem. at 3; Affidavit of Robert Gianninni.

10. The only Commandments the State was able to link historically to legal or core values and ideals were "thou shalt not kill," "thou shalt not commit adultery," and "thou shalt not bear false witness against thy neighbors." However, even the links to these commandments were quite attenuated, as the State

itself acknowledges that killing, in and of itself, is not illegal (moreover, the State itself authorizes death as punishment for certain crimes under certain circumstances), the links to adultery are found in statutes that are no longer on the books, and bearing false witness is only incorporated into our legal system to the extent that sworn witnesses are subject to perjury laws if they lie. Counsel also conceded that any association between the Second Commandment and old "Blue Laws" which in past times required certain commercial establishments to be closed for business on Sundays, and other such historical vestiges of the old sabbatic laws, is a stretch, and certainly not an expression of any "core" value or ideal.

purpose was to "show ... youngsters that there were such recognized codes of behavior [as the Ten Commandments] to guide and help them." *Freedom From Religion Found.,* 898 P.2d at 1024 n. 16. One of the witnesses testifying on behalf of Colorado opined that it was possible to construe commandments two through ten as being examples of law that this country has observed from its very beginnings. *See id.* at 1024 n. 17.

We are unpersuaded by the Colorado Supreme Court's factual findings. On the one hand, the stated purpose in that case, as well as in *Books,* for that matter, to wit, "to provide a code of conduct for youngsters," is quite different than Indiana's stated purpose in this case to "provide a reminder of our nation's core values and ideals." Although we withhold our view as to whether the purpose stated in *Freedom From Religion Foundation* and *Books* is itself secular, an issue that we expect to be resolved shortly by the Seventh Circuit, it is sufficient at this stage in these proceedings to note that the purposes are substantially different.[11] In addition, the witness's testimony in *Freedom From Religion Foundation* contradicts Indiana's concessions made at oral argument and described above. It is not enough to say that our nation's framers personally believed in the Ten Commandments, assuming they did, and offer that as proof that our country has incorporated those principles into the structures of government and adopted those values into the life of the republic from its inception. To the contrary, the First Amendment stands as strong and clear testimony to the fact that, while the

framers may very well have known of and been influenced by the Ten Commandments in their personal religious and spiritual lives, such personal religious influences were not allowed to preempt, negate, or otherwise supersede our national preference for secular governmental structures.

Thus, we conclude that the State's articulated purpose in erecting a Monument depicting the Ten Commandments is not a valid secular purpose, but is in fact religious in nature. This conclusion is reinforced by the very design of the Monument, as well as its words. The Ten Commandments are not physically linked to the other texts on the display, appearing by themselves on one side of the large tablet-shaped block. The other three sides of the Monument will, respectively, display the texts of other documents and the Monument's dedication. No indication will appear on the on the monument to the effect that the Ten Commandments are displayed for their historical significance, as might be suggested by their visual proximity to several other historical texts or with an explanatory marker.[12] Rather, the Ten Commandments will be displayed in such a way that a person looking at them will see only the Ten Commandments, as they are set out on a seven-foot tall limestone block. These factors reinforce our conclusion that the purpose of displaying the Ten Commandments is religious, not secular, and is thus, in violation of the Establishment Clause. Although this holding would suffice in terms of our First Amendment analysis,

11. It is for this reason that we regard the history of the original Ten Commandments monument that stood on the Statehouse grounds as irrelevant to our current analysis. On questioning at oral argument, the State acknowledged that the purposes behind the displays embodied in the 1958 monument and in the proposed monument are quite different—the purpose for the original monument having been to provide a code of conduct while the purpose for the proposed monument is to remind people of our nation's core values and ideals. Further, and perhaps as

important to our conclusion that the 1958 monument, its purpose and history are irrelevant, is the fact that that depiction was never subjected to a constitutional challenge.

12. These are provided only as examples of alternative designs for the Monument. We express no opinion as to whether such depictions would ultimately overcome the decidedly religious purpose in the design of the currently proposed and planned Monument.

we nonetheless will address the second prong of the *Lemon* test as well.

### b. Effect of the Proposed Monument

■ While the first part of the *Lemon* test focuses on the government's intent, the second prong demands that the challenged action not have the principal or primary effect of advancing religion. *See Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. "Following the Court's formal acceptance [of Justice O'Connor's formulation of the 'endorsement test' enunciated in her concurrence in *Lynch v. Donnelly,* 465 U.S. 668, 691, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)] in [*County of Allegheny,* 492 U.S. at 595, 109 S.Ct. 3086], the effect prong of [the *Lemon* test] has been analyzed under the 'perception of endorsement' test developed in [*Lynch* ]." *City of Marshfield,* 203 F.3d at 493. Under this test, we must determine "'whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" *Id.* (quoting *Lynch,* 465 U.S. at 691, 104 S.Ct. 1355 (O'Connor, J., concurring)). If we find that a "reasonable person could perceive that a government action conveys the message that religion or a particular religion is favored or preferred, the Establishment Clause has been violated." *City of Marshfield,* 203 F.3d at 493 (citing *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 778–79, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring)). Although this is a "reasonableness" test, "[e]very government practice must be judged in its unique circumstances to determine" whether it endorses religion. *Lynch,* 465 U.S. at 694, 104 S.Ct. 1355 (O'Connor, J., concurring). Thus, the context of the display, including its message, its presentation, and its surroundings must be factored into our determination.

In *County of Allegheny,* the content and location of the challenged displays assumed key roles in the Supreme Court's resolution of the constitutional issues presented. The Supreme Court reviewed a challenge to a creche displayed inside a county courthouse as well as the constitutionality of a menorah displayed outside the courthouse alongside a Christmas tree and a sign saluting liberty. The Court held that the creche was an unconstitutional endorsement of religion because there was nothing in its content or context that detracted from the religious message it imparted. *See County of Allegheny,* 492 U.S. at 598, 109 S.Ct. 3086. Along with the overtly religious content of the display, the Court noted the importance that:

> the creche sits on the Grand Staircase, the 'main' and 'most beautiful part' of the building that is the seat of county government.... No viewer could reasonably think that it occupies this location without the support and approval of the government. Thus, by permitting the 'display of the creche in this particular setting,' ... the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the creche's religious message.

*Id.* at 599–600, 109 S.Ct. 3086 (internal citation and footnote omitted). Equally important was what the Court *did not* look to in examining the context of the display containing the creche. *See id.* at 598 n. 48, 109 S.Ct. 3086.

> The presence of Santas or other Christmas decorations elsewhere in the county courthouse, and the nearby gallery forum, failed to negate the endorsement effect of the creche. The record demonstrates clearly that the creche, with its floral frame was its own display distinct from other decorations or exhibitions in the building.

*Id.*

In contrast, the Court did declare the display of the menorah to be constitutional. Unlike the creche, the constitutionality of which the Court examined by looking at the display alone, the Court looked at both the menorah and Christmas tree together and determined that the two symbols were

not exclusively religious, but represented holidays with both secular and religious dimensions. *See id.* at 613–14, 109 S.Ct. 3086. Thus, there was no endorsement, since "[i]n the shadow of the tree, the menorah is readily understood as simply a recognition that Christmas is not the only traditional way of observing the winter-holiday season." *Id.* at 617, 109 S.Ct. 3086.

The Seventh Circuit likewise has held unconstitutional displays of a nativity scene displayed inside a city hall. *See American Jewish Congress v. City of Chicago,* 827 F.2d 120, 128 (7th Cir.1987). In *American Jewish Congress,* the Seventh Circuit regarded as important the fact that the display was in the city hall, since:

> City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval. The presence of a nativity scene in the lobby, therefore, inevitably creates a clear and strong impression that the local government tacitly endorses Christianity.
>
> The message of endorsement is equally powerful on the symbolic level. Like the nativity scene itself, City Hall is a symbol—a symbol of government power.... A creche in City Hall thus brings together Church and State in a manner that unmistakably suggest their alliance.

*American Jewish Congress,* 827 F.2d at 128.

In another case, when faced with a constitutional challenge to city seals that contained Christian symbols, the Seventh Circuit focused on the powerful relationship between the government and symbols that represented government power. *See Harris v. City of Zion,* 927 F.2d 1401 (7th Cir.1991). In *Harris,* the Seventh Circuit held that a city seal that contained within it the obvious presence of a Latin cross and a city's seal, emblem or logo that contained a Latin cross and the words "God Reigns" had the unconstitutional ef-

fect of endorsing religion. *Id.* at 1413, 1415. The court noted that "[l]ike the seat of county government in *County of Allegheny,* or the City Hall Building in *American Jewish Congress,* the corporate seal of a municipality is 'plainly under government control ... (and is) a clear symbol of government power.'" *Id.* at 1412 (quoting *American Jewish Congress,* 827 F.2d at 128). Moreover, the Seventh Circuit noted that the seal presented a "more compelling case for finding the challenged display unconstitutional" due to its status as a permanent fixture as a symbol for the city. *See id.* at 1412. "The City's seal is a permanent statement that is viewed year-round, while the creche is displayed only seasonally amidst the secular celebration of Christmas." *Id.*

The location of a display involving the Ten Commandments, and its context, are just as important as with displays of other religious symbols, such as a creche or a Latin Cross. In his concurrence in *County of Allegheny,* Justice Stevens noted that a frieze on the south wall of the Supreme Court chambers included a depiction of Moses holding the Ten Commandments. *See County of Allegheny,* 492 U.S. at 652, 109 S.Ct. 3086 (Stevens, J., concurring). He wrote that, standing alone, this image might be seen to convey a message of "respect for Judaism, for religion in general, or for law." *Id.* Such an image standing alone, or alongside images of Confucius and Mohammed, would not be tolerated by the First Amendment. *See id.* However, in the context of a display that depicts images of Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John Marshall along with these three religious leaders, the overall effect "signals respect not for great proselytizers but for great lawgivers." *Id.* at 652–53, 109 S.Ct. 3086. Thus, the frieze as a whole is a "fitting message [for] a courtroom" and does not violate the First Amendment. *Id.* at 653, 109 S.Ct. 3086.

In *Harvey v. Cobb County,* 811 F.Supp. 669 (N.D.Ga.1993), *aff'd,* 15 F.3d 1097

(11th Cir.1994) (table text), the county sought to place a display containing the Ten Commandments and the Great Commandment in a county courthouse. *Id.* at 671–72. The court, citing *County of Allegheny,* indicated that both the content and context of the display were significant in determining its constitutionality. *See id.* at 677. Relying on *Stone, see supra,* the court readily determined that the display had a religious content. *See id.* (noting that *Stone* considered and rejected the argument that the Ten Commandments is not religious because it can be viewed as a "historical, jurisprudential cornerstone of American legal significance."). Equally significant to the court's holding that the display was unconstitutional was that, unlike the frieze on the wall of the Supreme Court discussed by Justice Stevens in *County of Allegheny,* it sat alone in an alcove in the courthouse without any countervailing secular passages or symbols present. *See id.* at 678, 109 S.Ct. 3086.

> Moreover, the display is located in the Cobb County State Court Building, a seat of judicial authority in the county. Although the panel is not located in the most prominent part of the building, it is, nonetheless, located high on the wall, above a marble bench, near the Clerk's Office and the Traffic Court courtrooms. 'No viewer could reasonably think it occupies this location without the support and approval of the government.'

*Id.* (quoting *County of Allegheny,* 492 U.S. at 598, 109 S.Ct. 3086).

In the trio of cases decided recently by the District Court for the Eastern District of Kentucky, the content and location of the displays again contributed to the conclusion that they unconstitutionally endorsed religion. As previously described, the displays consisted of the Ten Commandments and other texts chosen solely for their religious references. *See McCreary County,* 96 F.Supp.2d at 687. The court held that the displays presented an "overriding theme ... of religion and more specifically of Christianity." *Id.* Moreover, the displays were placed in locations that had unique importance—inside a courthouse and posted on classroom walls. *See McCreary County,* 96 F.Supp.2d at 688–89 (courthouse); *Harlan County Sch. Dist.,* 96 F.Supp.2d at 676–77; *Pulaski County,* 96 F.Supp.2d at 700 (courthouse). The court, in *McCreary County,* distinguished the display at issue in that case, located inside of a courthouse, from the displays found constitutional in *Books, Anderson v. Salt Lake City Corp.,* 475 F.2d 29 (10th Cir.1973), and *Suhre,* which displays were "removed from government buildings" and were "part of some larger artistic rendering or academic display encompassing a wide range of cultural, religious, and legal traditions." *McCreary County,* 96 F.Supp.2d at 689.[13]

In contrast, as we have previously cited at length, in *Freedom From Religion Foundation,* the Supreme Court of Colorado held a display of the Ten Commandments constitutional. That display, made of stone and shaped in the form of two tablets, contained a floral design, Phoenician letters that formed no intelligible words, an "all seeing eye," an American eagle grasping an American flag, a version of the Ten Commandments, two stars of David, the two Greek letters, Chi and Rho, one superimposed upon each other, which symbolize the first two letters in the name "Jesus Christ." *See* 898 P.2d at 1016. The Colorado monument was located in a

---

**13.** The court also noted that the Tenth Circuit has called into question its holding in *Anderson,* that a Ten Commandments monument identical to the one in *Books* and the one which previously stood on the Indiana Statehouse grounds was constitutional, in light of the Supreme Court's supervening opinion in *Stone. See Summum v. Callaghan,* 130 F.3d 906, 910 n. 10 (10th Cir.1997) (decided on grounds of freedom of speech). The Eastern District of Kentucky also doubted the validity of the holdings in *Books* and *Anderson,* given *Stone*'s holding that a governmental requirement that the Ten Commandments be displayed in classrooms was unconstitutional. *See McCreary County,* 96 F.Supp.2d at 688.

state-owned park on property adjacent to, but removed from, the State Capitol building. *See id.* at 1015–16. The court held that the park was "more of a museum setting" and that the Ten Commandments monument itself was one of the "smallest and least conspicuous displays" in the park. *Id.* at 1025. Moreover, the court found significance in the fact that the display, although on public property, was not located "where citizens exercising their right to access the courts or other government benefits might encounter the monument ... [but] in an inconspicuous place where citizens may be found by choice and are not necessarily present for purposes related to government." *Id.* In light of the many countervailing secular symbols surrounding the Ten Commandments on the face of the monument and given its out-of-the-way location, the court held that the monument was not an endorsement of religion. *See id.*

In *Books,* the monument was shaped in the form of two large, stone tablets, and had on its face the same display at issue in *State v. Freedom From Religion Foundation, Inc. See Books,* 79 F.Supp.2d at 983. It was located on a grass lawn near the entrance to a municipal building. *See id.* at 984. The court noted that other, historical monuments were maintained by the City, although "none are visible at the same time as the challenged monument," other than a War Memorials monument. *Id.* The court ruled that the content of the monument was not "exclusively religious," given its view that the Ten Commandments hold "both religious and historical significance in this nation." *Id.* at 1002. Despite the proximity of the monument to the entrance to the courthouse, the court held that the monument was not "obtrusive" and thus was constitutional in its context. *See id.*

In *Suhre,* the monument in question contained small plaques containing the Ten Commandments, but was "overwhelmingly dominated by Lady Justice and which contain[ed] other secular objects such as the sword of justice and the scales of justice flanked by the American and North Carolina flags." *Suhre,* 55 F.Supp.2d at 395–96. Much like the frieze discussed by Justice Stevens in *County of Allegheny,* given its context, "[t]he display touts nothing more than an effort to recall the origin of modern law, by reference to an ancient source of law and justice. The overall, basic message is equal justice before the law." *Id.* at 397. Thus, although the frieze was located in a courtroom, the court held it not to violate the Establishment Clause. *See id.* at 399.

Turning to the facts of our case, we must determine whether a reasonable person would perceive the Monument as conveying a message of government endorsement of religion. *See Lynch,* 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring); *City of Marshfield,* 203 F.3d at 493. We conclude that a reasonable person looking at this monument would undoubtedly view it as an endorsement of religion.

Looking at the monument itself, two factors strongly indicate an endorsement of religion. One is that the text of the Ten Commandments is prominently located, to the exclusion of everything else, on one side of this seven-foot tall monument. Although the direction the monument will face has not yet been determined, people who approach the monument from the side on which the text Ten Commandments is contained will see only that. In order to understand the "historical context" which the State says is the Monument's intended purpose, a person would have to walk completely around the monument, in a 360-degree manner, to see the Bill of Rights, the Preamble to the Indiana Constitution, the Ten Commandments and the dedication. The State, itself, acknowledged at oral argument that a reasonable person would not likely circumnavigate the Monument, especially when there are no pathways immediately near or around it.

Moreover, even if a person were to review the entire texts on all four sides of the Monument, there is nothing that would

allow a reasonable person to put the documents into a secular context. While the State argues that the "secular" language predominates on the face of the Monument, we disagree. It is undisputed that the engraved letters forming the Ten Commandments will be one inch tall and all capital letters, a typeset that no doubt is intended to indicate the importance of the ideals contained therein. In contrast, the size of the lettering of the Bill of Rights is to be only five-eighths of an inch high and the text of the other documents is likely to be even smaller. Looking at these documents together, the Ten Commandments would likely be viewed as the most prominent in comparison to the other depictions on the Monument.

In addition, no marker identifies any linkage among the documents on the Monument. In fact, the Preamble to the Indiana Constitution is unattributed as such, the words merely being laid out on one side of the Monument for people to read without further explanation, identification or authentication. Reviewing the Monument as a reasonable person would, it is likely that a religious message would be perceived, rather than a "historical" one.

Even if we extend our examination of the context of the display to the other displays on the Statehouse lawn, we still must conclude that the message endorses religion.[14] This monument is designed to be quite substantial, standing seven-feet tall and weighing almost 11,500 pounds. From the descriptions of the other displays on the Statehouse lawn, it will certainly stand out. The majority of the displays on the lawn are either placards dedicating trees or statues of historical figures; those that are not placards or statues are in the shapes of nondescript blocks or pillars or plates. In contrast, the size and shape of the Monument accentuate its religious message. The Ten Commandments and the Bill of Rights will each be on a tablet-shaped block of limestone, a shape which we have previously noted is unique and unmistakable. Even if one cannot read the text of the Monument without approaching it, as the State argues, one will clearly be able to identify the shape of this seven-foot tall monument from some distance across the Statehouse lawn. Indeed, we assume this is one of the purposes of utilizing this unique shape—that it will be recognizable from a distance—since no paths are to be constructed to allow for closer viewing. Thus, while the State argues that only those who choose to approach will read the message of the Monument, we believe that anyone walking along the south or west side of the Statehouse who sees the shape of the Monument will undoubted associate it with and regard it as an explicit endorsement of the Ten Commandments.

The imputed endorsement is enhanced as well due to the planned location for the Monument. This is not a display that is going to be placed in a museum-like setting or in a park far removed from the seat of governmental power. *See Freedom From Religion Found.*, 898 P.2d at 1025; *see also Doe v. Small*, 964 F.2d 611, 619 (7th Cir.1992). Like the displays found unconstitutional in *County of Allegheny, American Jewish Congress, Harris,* and *Harvey,* the Monument is to be located on the lawn of the Statehouse, at the seat of government for the entire state, an area over which the State has exclusive and obvious control. While the Monument will

---

**14.** The State contends that the monuments contained in the interior of the Statehouse must also be considered, as most Plaintiffs contend that they will pass the Monument to do business inside of the Statehouse. *See* Opp'n Mem. at 10. However, *County of Allegheny* made it clear that we are to examine the display in a context that is reasonable.

*See id.* at 598 n. 48, 109 S.Ct. 3086. Here, as in *County of Allegheny,* the presence of other monuments in locations remote from the challenged monument is not reasonably regarded as part of the context. Thus, we regard the presence of monuments inside of the Statehouse as irrelevant to our analysis.

not be physically in or on the building that provides the locus of the State government's power, its placement will be well within the boundaries of the property that a reasonable person would associate with the Statehouse itself, "marked with the stamp of government approval ... [and] inevitably creat[ing] a clear and strong impression that the ... government tacitly endorses" religion. *American Jewish Congress*, 827 F.2d at 128. Although *Books* found that a monument displaying the Ten Commandments on the lawn of the city's municipal building did not convey this stamp of approval by the government, we say respectfully that we likely would not share that assessment.

Equally important as the Monument's overall endorsement of religion is the fact that it will become a permanent display. Unlike the seasonal displays held constitutional in *County of Allegheny* and *Lynch*, the Monument is not a temporary display that will be placed on the Statehouse lawn on a temporary basis. In fact, everything about it's size and construction evinces permanence. Like the seals found unconstitutional in *Harris*, the Monument is a display intended to be a "permanent statement that is viewed year-round." *Harris*, 927 F.2d at 1412. This aura of permanence strengthens the message of endorsement that a reasonable person would perceive.

Thus, because of the content and shape of the proposed Monument, the proposed location and the permanence of the display, we conclude that a reasonable person would perceive in this display a message of government endorsement of religion, which compels our finding that the Monument fails the second prong of the *Lemon* test.

### c. Conclusion

We have thus determined that Plaintiffs have shown a likelihood of prevailing on the merits of their First Amendment claim, in that the Monument, according to our preliminary analysis, fails both the first and second prongs of the *Lemon* test, by having a religious purpose and by its implied endorsement of religion. Either of these deficiencies would suffice to cause a violation of the Establishment Clause. Accordingly, we hold that Plaintiffs have established a reasonable likelihood of succeeding on the merits of their First Amendment challenge.

### 2. Inadequate remedy at law and irreparable harm

The State has conceded that no adequate remedy at law exists for the Plaintiffs' potential First Amendment harm. While the State questions the harm that will be experienced by the Plaintiffs if we fail to enjoin the placement of the Monument, a First Amendment violation, for even "minimal periods of time," is "unquestionably ... irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality).

### 3. Balance of harms to the parties and the public interest

The State asserted at oral argument that the harm to itself, if erection of the Monument is enjoined pending a final ruling on the merits (and perhaps an appeal), will occur by its being placed in the position of receiving a gift which it would be unable to accept. Compared to the effects of the possible First Amendment violation that would be incurred by the Plaintiffs if we fail to enter an injunction, the State's harm is clearly inconsequential. We have difficulty, in truth, seeing any actual harm to the State from a granting of injunctive relief. Further, the resultant harm of allowing the construction of the Monument to go forward, only to have to tear it all down if it is finally held to be unconstitutional, is obvious to all. As previously noted, the Seventh Circuit Court of Appeals currently has under advisement the Northern District of Indiana's opinion in *Books*, the resolution of which promises to have a significant impact on the resolution of this case. In light of that impending ruling, maintenance of the status quo is altogether prudent. We believe this result

to be fully consonant with the public interest as well.

*Conclusion*

Having determined that the Plaintiffs have a reasonable likelihood of succeeding on the merits of their First Amendment challenge, that they have no adequate remedy at law and would suffer irreparable harm if preliminary relief were to be denied, that the balance of the harms favors the Plaintiffs, and that the public interest is in line with granting the Plaintiffs their requested injunctive relief, we hold that the Plaintiffs are entitled to their requested relief. Plaintiffs' motion for preliminary injunction is *GRANTED*. Pending a resolution of the merits of this case or until further order of the Court, we Hereby *ENJOIN* the State from henceforth taking any further steps to erect the proposed monument containing the Ten Commandments, the Bill of Rights, and the Preamble to the Indiana Constitution on the Statehouse grounds.