**Jennifer KIMBLEY, Plaintiff,**

v.

**LAWRENCE COUNTY, INDIANA, Defendant.**

**No. NA 00–207–C–B/S.**

United States District Court, S.D. Indiana, New Albany Division.

Nov. 14, 2000.

---

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN.

Francis J. Manion, American Center For Law & Justice, New Hope, KY.

### ENTRY GRANTING INJUNCTIVE RELIEF

BARKER, Chief Judge.

Plaintiff, Jennifer Kimbley, filed a request for injunctive relief, pursuant to Federal Rule of Civil Procedure 65(a) (preliminary injunction) and 65(b) (temporary restraining order), seeking to prevent Defendant, Lawrence County, Indiana ("County"), from erecting and maintaining a monument containing the Ten Commandments on the Lawrence County Courthouse lawn. Before we had an opportunity to address Plaintiff's motions, and after certain officials of Lawrence County clearly had notice that this same monument had by order of this court been previously prohibited from display on the Indiana Statehouse grounds and further knew that this new litigation was pending before this court, the County hastily erected said monument on the county courthouse lawn. For the reasons discussed below, we *GRANT* Plaintiff's motion and grant a preliminary mandatory injunction ordering the County to remove the monument forthwith.

*Facts*

#### A. Background

Earlier this year, following enactment of a state statute authorizing displays of the Ten Commandments on state property (Ind.Code § 4–20.5–21–2), Indiana State Representative Brent Steele of Lawrence County ("Representative Steele") enlisted the Indiana Limestone Institute to create a limestone monument containing the Ten Commandments (which we will describe in detail below) and donate it to the State of Indiana to be placed on the Indiana Statehouse grounds. *Indiana Civil Liberties Union v. O'Bannon,* 110 F.Supp.2d 842, 845 (S.D.Ind.2000) (*"O'Bannon"*), *appeal pending.* The Indiana Civil Liberties Union ("ICLU") filed suit to prevent the positioning of this monument on the statehouse grounds and, after conducting an evidentiary hearing, we ruled that there was a substantial likelihood that the ICLU would prevail on the merits of its First Amendment challenge to the monument's placement and granted the requested preliminary injunction, enjoining the State from taking any steps to erect the proposed monument on the statehouse grounds. *Id.* at 858–59. That decision has been appealed to the Seventh Circuit Court of Appeals.

Sometime thereafter, approximately six to eight weeks ago, Representative Steele contacted Timothy P. Terry ("Terry"), President of the Lawrence County Commissioners (the "Commission"), informing him that the monument (the "Monument") could not be placed on the Statehouse lawn because an injunction had been granted by this court and asking Commissioner Terry if it could be temporarily placed on the grounds of the Lawrence County Courthouse (the "Courthouse") until a final decision was handed down by the Court of Appeals. *See* Deposition of Timothy P. Terry ("Terry Dep.") at 24.

Although Representative Steele requested only temporary placement of the Monument on the Courthouse grounds, Commis-

sioner Terry has since come to believe that it may become a permanent fixture, as, according to his testimony at his deposition which was repeated at the November 13, 2000 hearing, "[t]here ha[ve] been some rumblings from the stone company that they may go ahead and build another one for the Statehouse" if the Governor prevails in appealing *O'Bannon* (the original monument apparently incorporates a spelling error as well). Terry Dep. at 7. Commissioner Terry further testified that he clearly understood that the Monument which Representative Steele was proposing for display by Lawrence County was the same one that was at issue in *O'Bannon* and was aware that an injunction had been entered in *O'Bannon* preventing its placement on the Statehouse grounds. Although he professed not to know the legal intricacies involved in an injunction, he evidenced an accurate understanding that, in essence, an injunction prevents a person from taking an act that he might otherwise have taken.

### B. The County's Decision to Erect the Monument

When Representative Steele first approached Commissioner Terry, Terry indicated to Steele that he would need a description of the monument for the Commission to consider it. Terry Dep. at 46. Although Steele orally described the monument to Terry during this conversation, no other formal written description of the Monument was received by the Commission. *Id.* at 46–47. Nevertheless, on October 24, 2000, the Commission (composed of Commissioner Terry, Commissioner Robert H. Adamson ("Adamson"), and Commissioner Janie Chenault ("Chenault")) voted unanimously on an orally offered motion to accept the Monument and to place it on the Courthouse lawn as a temporary display. Terry Dep., Ex. 12 (minutes of the October 24, 2000, County Commission meeting). This resolution also directed that the County

Engineer, Bob Burcham ("Burcham"),[1] determine what was needed to serve as a base for the Monument. *Id.* The Commissioners each testified at the evidentiary hearing that they intended their October 24th resolution to authorize County Engineer Burcham to proceed with the installation of the proposed Monument.

Based upon the deposition exhibits and evidence adduced at the hearing, we have been able to reconstruct the following time-line: Following the October 24th adoption of the resolution by the Commissioners, on Monday, October 30, 2000, Plaintiff Kimbley filed this litigation, and her attorney sent a copy, via facsimile, to the County Attorney, David Smith ("Smith"). Terry Dep., Ex. 13. Upon receiving notice of the suit, County Attorney Smith realized that he had a conflict of interest (having previously represented Kimbley in an unrelated matter). The next day, on Tuesday, October 31, 2000, Smith contacted the County's current counsel, Francis Manion, to request his assistance in representing the County in the matter. After confirming that Manion was available to represent the County, Smith contacted each of the Commissioners, notified them that a lawsuit had been filed seeking an injunction, informed them that he had a conflict of interest due to his preexisting relationship with Kimbley and obtained their approval to retain Manion as counsel in this matter. Although each of the Commissioners initially testified that he/she did not know about the litigation until after the Monument was actually placed on the lawn, both Commissioner Adamson and Commissioner Chenault recalled being in contact with County Attorney Smith the day before the Monument was erected and were informed of the lawsuit, its request for injunctive relief, and the need to retain Mr. Manion to handle it.

---

1. The County notified the court that Burcham has since resigned, although they assert that it was for reasons unrelated to the instant matter, and that the County Engineer position is currently vacant.

The day prior to the erection of the Monument (October 31st), plaintiff's counsel sent notice to both Smith and Manion informing them that he would be seeking a temporary restraining order at 10:00 a.m. on Wednesday, November 1, 2000. Terry Dep., Exs. 14, 15. The parties stipulated that both Smith and Manion received Plaintiff's counsel's letters and that receipt constituted notice by the County of the lawsuit and its request for injunctive relief.

During the time-frame of these communications between the Commissioners and counsel for both parties (on Tuesday, October 31, 2000), the cement base for the Monument was being laid on the Courthouse grounds, under the direction of County Engineer Burcham. At some point prior to the laying of the base, Burcham had approached Commissioner Chenault to request that she obtain a donation of cement for the base. Both she and Commissioner Terry testified that they were involved in the decision to obtain the donation of cement from a firm named "IMI." Commissioner Chenault testified that she thus knew that the process was in place to erect the Monument, although the laying the cement base was undertaken before she actually knew about the lawsuit. The Commissioners further testified that, although the cement base was set with assistance from members of the County Highway Department, these individuals volunteered their time and no County funds were to be spent in the laying of this base.

The next day, on Wednesday, November 1, 2000, beginning at approximately 7:00 a.m., the Monument was installed on the Courthouse lawn. Terry Dep. at 14–15, 19. All three Commissioners arrived at the scene at varying times during the process: Commissioner Adamson arrived prior to the Monument being in place, Commissioner Terry arrived just as it was being put in place, and Commissioner Chenault arrived after County Engineer Burcham called her to tell her it had been erected. Representative Steele was also present during the erection of the Monument, videotaping the process. None of the Commissioners was aware in advance that the Monument was to be erected at that early date; Commissioner Terry testified that he was surprised when he arrived at the Courthouse to see that it was going up that day. Although Commissioner Adamson testified that he was aware of the pending lawsuit as early as the day before and that he arrived prior to when the placement of the Monument was finished, he did nothing to prevent County Engineer Burcham from continuing the construction and did not inform him of the lawsuit's status.

The labor to erect the Monument was also provided by volunteers. None of the Commissioners could inform the court about where the Monument was stored prior to its arrival at the Courthouse lawn, nor could any of them definitively state who physically brought it to the location (although they speculated that it had been stored and conveyed to the scene by Evans Stone, the company which originally donated the limestone). It is clear, in any event, that the actual setting of the Monument occurred under the direction of County Engineer Burcham and the bulk of the labor was provided by Tri–County builders; approximately five employees of the County highway department also participated in the project. Apparently, a private donor has agreed to reimburse the County for the time of the county officials involved in the process.

In contrast to Commissioners Adamson and Chenault, Commissioner Terry indicated that he did not learn of this litigation until sometime in the afternoon of November 1, 2000. Terry Dep. at 17. Despite Terry's professed ignorance, the local newspaper had published an article about the filing of the lawsuit on October 31st, about which both other commissioners testified they were aware. Commissioner Terry also indicated that County Attorney Smith never informed him that the County had been sued with respect to the proposed Monument. Id. at 17. Moreover, Commissioner Terry testified at his depo-

sition that on November 1st, the newspaper contacted him about the lawsuit and County Attorney Smith told him that the County had received "some sort of fax" from the ICLU, but Commissioner Terry "was in a hurry" and did not get any further information. Terry Dep. at 46.

### C. The Monument

The Monument at issue in this case is the same one the placement of which on the Statehouse grounds we previously enjoined in *O'Bannon.* Terry Dep. at 12–13; Exs. 1–5.[2] As mentioned previously, the Monument was designed under Representative Steele's direction. *O'Bannon,* 110 F.Supp.2d at 845. The original intent was to place it on the Statehouse lawn to replace a monument containing the Ten Commandments that had previously stood on the grounds from 1958 until it was vandalized and destroyed in 1991. *Id.* at 845.

This original design called for a more substantial monument, hopefully more impervious to vandalism, containing only a text of the Ten Commandments. *Id.* However, after being apprised of the Colorado Supreme Court's ruling in *Colorado v. Freedom From Religion Foundation, Inc.,* 898 P.2d 1013, 1017 (Colo.1995), in which the court held a monument containing the Ten Commandments to be constitutional, Representative Steele (who is also an attorney) decided to add two other historical documents to the monument, namely, the Bill of Rights and the Preamble to the 1851 Indiana Constitution. *O'Bannon,* 110 F.Supp.2d at 845–46.

The Monument consists of two pieces, a base and an upper portion, weighing in total approximately 11,500 pounds. *O'Bannon,* 110 F.Supp.2d at 846; Terry Dep. Ex. 1. The bottom piece is a rectangular block of limestone, six-feet, seven-inches wide, four-feet, seven-inches deep, and two-feet, eight-inches long. *Id.* On top of the base sits a four-sided block—ta-

pered, with two large faces, each measuring four-feet, four-inches in height by three-feet, seven-inches in width, while the smaller faces are triangular, also four-feet, four-inches tall, but tapering from a width of approximately two-feet, six-inches at the base to six-inches at the top. *Id.* The Monument itself rests on the cement base discussed above and laid on October 31, 2000, although a sealant has been applied to the base.

At the hearing, the County represented that since the original intent was for the Monument to be a temporary display, it could be easily removed by breaking the seal between the upper portion of the Monument and the base. The County anticipated that such action would not destroy or harm it in any way.

The large surfaces on the top block are tablet shaped, that is, the stones are carved with two rounded arcs or arches at the top; (it is a form widely utilized in artistic depictions of the stone tablets delivered or handed down by Moses upon his return from Mt. Sinai). One of the large surfaces displays the following text:

TEN COMMANDMENTS

I. THOU SHALT HAVE NO OTHER GODS BEFORE ME

II. THOU SHALT NOT MAKE UNTO THEE ANY GRAVEN IMAGE

III. THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN

IV. REMEMBER THE SABBATH DAY TO KEEP IT HOLY

V. HONOR THY FATHER AND THY MOTHER THAT THY DAYS MAY BE LONG IN THE LAND WHICH THE LORD THY GOD GIVETH THEE

VI. THOU SHALT NOT KILL

VII. THOU SHALT NOT COMMIT ADULTERY

---

**2.** Since the Monument is essentially the same as the one at issue in *O'Bannon,* we cite to our factual findings therein in relation to the monument's design and will note here only any differences which exist.

VIII. THOU SHALT NOT STEAL
IX. THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR
X. THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE OR WIFE OR ANYTHING THAT IS THY NEIGHBOR'S.

*O'Bannon,* 110 F.Supp.2d at 846. The text of the Ten Commandments is set forth in all-capital letters approximately one-inch in height and that the title "Ten Commandments" is in all-capital letters approximately one-and-a-half-inches in height. This is the only text appearing on one side of the Monument. *See id.;* Terry Dep. Ex. 1. The second large tablet-shaped face of the Monument displays the text of the Bill of Rights from the United States Constitution which is engraved all in capital letters each of an approximate height of five-eighths of an inch. *See id.;* Terry Dep. Ex. 2.

On one triangular face of the Monument is the text of the Preamble to the 1851 Indiana Constitution—

> To the end, that justice be established, public order maintained, and liberty perpetuated: We, the People of the State of Indiana, grateful to Almighty God for the free exercise of the right to choose our own form of government, do ordain this Constitution.

*Id.* ¶ 19. Whereas the source of this text was not set out on the monument at issue in *O'Bannon,* the phrase "State Constitution Preamble" is now displayed above the text. *Compare O'Bannon,* 110 F.Supp.2d at 846, *with* Terry Dep., Ex. 3. The other triangular face identifies the Indiana Limestone industry as the donor of the Monument, with the historical explanation that "[t]his monument replaces one donated by the Aeries and Auxiliaries of the Indiana Fraternal Order of Eagles on October 25, 1958." *O'Bannon,* 110 F.Supp.2d at 846 (although the parties have notified the court that the word "fraternal" is misspelled, it is not apparent from the pictures in what way the misspelling occurs). We were not informed of the size of the lettering of these two passages, but they appear to be balanced in the context of the remainder of the Monument. *See* Terry Dep., Exs. 1–4.

Despite the Monument's explicit reference that it replaces a previous monument donated by the Fraternal Order of Eagles in 1958, no such monument has ever existed on the County Courthouse lawn. Terry Dep. at 9–10. It is undisputed that this quote was engraved on the Monument before we entered our injunction in *O'Bannon* and that the reference is to the monument which previously existed on the Statehouse grounds. Terry Dep. at 10.

### D. The Courthouse Grounds

The Lawrence County Courthouse has two entrances, one to the north and one to the south. Terry Dep. at 21. A grassy area surrounds the north, east and west sides of the building. *Id.* at 21, 26–27. The monument containing the Ten Commandments is located on the north side of the Courthouse and is the only monument on that side of the building. Terry Dep. at 26–27.

The Monument rests approximately six feet from the sidewalk that passes in front of the Courthouse, adjacent to the street and approximately twenty to twenty-five feet from a walkway that goes alongside the north side of the Courthouse building. *Id.* at 21–22. The part of the Monument containing the Ten Commandments faces out towards the sidewalk and vehicular traffic in such a way that it is readable to persons passing by; the text of the Bill of Rights faces towards the Courthouse entrance. *Id.* There is no explanatory plaque or sign describing why the Monument is on the Courthouse lawn. *Id.* at 29. Commissioner Terry testified that he is unaware of the reason for the Monument being oriented as it is. *Id.* at 22–23. Counsel for the County represented to the court at oral argument that a person standing on the sidewalk on the north side of the Courthouse lawn, facing the monument (from the Ten Commandments side)

and the Courthouse, would perceive no other monuments, plaques, or memorials.

On the west side of the Courthouse, there is a large war memorial. Terry Dep. at 25; Ex. 6. This memorial is flanked on either side by a limestone eagle and immediately behind it there are three markers with bronze plaques honoring veterans of the Korean War, World War II and the Vietnam conflict. Terry Dep. at 25; Ex. 7, 9. The phrase, "Defenders of freedom for God and country," is engraved on the plaques. Terry Dep. at 43. Immediately behind those markers is a monument called the "Cornerstone of Freedom," flanked by two cannons. Terry Dep. at 25-26; Ex. 8. Finally, next to those markers is a peace pole which has on it, in a number of languages, the phrase "May peace prevail on earth." Terry Dep. at 27-28.

The only item on the east side of the building is a sign, one side of which indicates that the land was the site of various courthouses and the other side advising that there is a historical museum in the Courthouse basement. *Id.* at 27. The south side is currently devoid of both grass and monuments; however, Commissioner Terry testified that the County intends to place a limestone gazebo that will take up the southwest corner of the lawn which will have an as yet undetermined inscription (although it will likely bear the names of the Commissioners and identify the limestone company donating it). Terry Dep. at 28.

### E. Articulated Purpose for the Monument

At the hearing, the County represented that the purpose for placing the Monument is slightly different than that advanced in *O'Bannon*, to wit, to display values common to the local community, including both secular and religious values.[3] Commissioner Terry testified that he was accurately quoted by the local newspaper as stating, in reference to the Ten Commandments:

> I was raised by those values and I think somewhere, whether you believe in them or not, somewhere down the line each and every person was raised by those values.
>
> . . .
>
> I am a God fearing, red-blooded, American citizen who believes in his rights and the rights of the rest of the citizens also. I was raised on those values. I really don't know anybody that wasn't raised by these values.

Terry Dep. at 30. Commissioner Terry believes that the Ten Commandments, the Bill of Rights, and the State Constitution's Preamble all represent values, specifically, with regard to the Ten Commandments, the values reflected are those of not killing, stealing, or lying. Terry Dep. at 31. In addition, he testified that the following commandments express other important values:

> Commandment: Thou shalt have no other gods before me.
>
> Value: You should only worship one God.
>
> Commandment: Thou shalt not make unto Thee any graven image.
>
> Value: "I know that I can't worship this stone."
>
> Commandment: Thou shalt not take the name of the Lord, thy God, in vain.
>
> Value: "You shouldn't use God's name in vain."
>
> Commandment: Remember the Sabbath Day, to keep it holy.
>
> Value: "Everyone needs a day of rest," specifically, the Sabbath.

Terry Dep. at 32-33. Commissioner Terry testified that the Ten Commandments is posted to advance these values. Terry Dep. at 33.

Terry also testified that be believes laws against killing are based in some way upon

---

**3.** In *O'Bannon*, the articulated purpose was to display "ideals that all people need to be reminded of" and "some of our nation's core values." *Id.* at 847.

the Ten Commandments. Terry Dep. at 38. Terry further testified that the Ten Commandments are connected to ·and influenced the Bill of Rights, although he acknowledged that there were other legal influences on the Bill of Rights which he could not specifically identify and could not articulate how specifically they are connected. Terry Dep. at 35–36. He further testified that there are no monuments on the Courthouse lawn depicting these other influences on the Bill of Rights "[p]robably because the citizens haven't asked us to put it there." *Id.* at 39. Finally, Commissioner Terry testified that the Monument is on the Courthouse lawn to honor the importance of the limestone industry in the County, but acknowledged that this reason does not explain why the documents on the monument were chosen to be depicted. *Id.* at 34.

### F. The Plaintiff

Kimbley is both a taxpayer and resident of the County. She objects to any taxpayer money going to the construction and maintenance of the Monument and alleges that she is forced to come into direct and unwelcome contact with it frequently in the course of her life as a citizen of the County; specifically: she drives past the Courthouse three-to-four times per week while going about her regular activities; she frequently uses the genealogy room in the basement of the Courthouse to do genealogy research; and she goes to the Courthouse to pay her taxes. Compl. ¶¶ 34–36.

### Discussion

### A. Preliminary Injunction Standard

█ In order to be entitled to a preliminary injunction, the moving party must demonstrate:

(1) some likelihood of prevailing on the merits, and (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied. If the movant clears these two thresholds, the court must consider (3) the irreparable harm the nonmovant will suffer if preliminary re-

lief is granted, balanced against the irreparable harm to the movant if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties.

*Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 63 F.3d 581, 585 (7th Cir.1995); *see also Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667, 675 (7th Cir.1987). The heart of this test is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,* 744 F.2d 588, 590 (7th Cir.1984).

### 1. Likelihood of success on the merits: Establishment Clause standards

Plaintiff's first obligation is to establish some likelihood of success on the merits of her challenge to the Monument on First Amendment–Establishment Clause grounds. This is no small assignment, given the profusion and confusion reflected in the case law and in Supreme Court precedent. As Judge Sharp noted in his recent decision in *Books v. City of Elkhart,* 79 F.Supp.2d 979, 982 (N.D.Ind.1999), *appeal pending,* there are no fewer than five Supreme Court tests for determining when government action penetrates the wall between church and state. *Id.* at 989 & n. 5. However, since both parties in the case at bar agree that the substantive law standards governing this case are those set out in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), we need not and will not engage in a full-scale analysis of each possible test. Our approach is validated by recent reaffirmations, by both the Supreme Court and the Seventh Circuit, of the continuing vitality of the *Lemon* standards. *See Agostini v. Felton,* 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Freedom from Religion Found., Inc. v. City of Marshfield,* 203 F.3d 487, 493 (7th Cir. 2000); *Bridenbaugh v. O'Bannon,* 185 F.3d 796, 797–98 (7th Cir.1999), *cert. de-*

*nied,* —— U.S. ——, 120 S.Ct. 1267, 146 L.Ed.2d 217 (2000).[4]

■ Under *Lemon,* a governmental action is constitutional under the Establishment Clause if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster excessive governmental entanglement with religion. *See Lemon,* 403 U.S. at 611–12, 91 S.Ct. 2105. A governmental action "violates the Establishment Clause if it fails to satisfy *any* of these prongs." *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (emphasis added). Although the continuing vitality of the *Lemon* test has been debated among jurists and other legal scholars, the Supreme Court recently reaffirmed that "the general principles we use to evaluate whether government aid violates the Establishment Clause have not changed." *Agostini,* 521 U.S. at 222–23. Thus, Establishment Clause analysis continues to focus on "whether the government acted with the purpose of advancing or inhibiting religion ... [and] whether the [action] has the 'effect' of advancing or inhibiting religion [as well as whether the action involves an excessive entanglement with religion]." *Agostini,* 521 U.S. at 232, 117 S.Ct. 1997.

The general principles laid out in *Lemon,* have been redefined by the Supreme Court so that under current interpretations the first two factors are characterized or construed as an "endorsement" test. *See, e.g., Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); *County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). As the Seventh Circuit recently noted,

> [f]ollowing the Court's formal acceptance in *County of Allegheny* ..., the effect prong of [the *Lemon* ] test has been analyzed under the 'perception of

endorsement' test developed in *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). Under this test, 'the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'

*City of Marshfield,* 203 F.3d at 493.

Kimbley concedes that the proposed Monument does not implicate the third prong of the *Lemon* test, that is, it does not promote "excessive entanglement" of the government with religion; thus we only consider whether the Monument has a secular purpose and whether the effect of the Monument is to advance or inhibit religion.

*a. Purpose for creating the Monument*

■ The general rule when attempting to determine the purpose behind a governmental action is to consult and to defer to the stated purpose for the action. *See Edwards,* 482 U.S. at 586–87, 107 S.Ct. 2573. While the secular purpose need not be the exclusive purpose for taking the action, it must be sincere and not a sham to avoid a potential Establishment Clause violation. *See Bridenbaugh,* 185 F.3d at 800, 801 (citing *Lynch,* 465 U.S. at 681 n. 4, 104 S.Ct. 1355 and *Edwards,* 482 U.S. at 586–87, 107 S.Ct. 2573). Since the avowed purpose may not be a "sham," courts have looked at both the context of the display as well as the content of the display to determine if the purpose is in fact secular. *See County of Allegheny,* 492 U.S. at 597, 109 S.Ct. 3086.

In conducting this analysis, we, of course, examine first the applicable precedential law (as we did in *O'Bannon* ). In *Stone v. Graham,* the Supreme Court held that Kentucky legislation requiring the posting of the Ten Commandments in the back of every classroom in the common-

---

**4.** The anticipated Seventh Circuit decisions reflecting its review both of *Books* and *O'Bannon,* the former of which was argued there in May of this year, will be highly informative on

the issues the parties have presented to us, and perhaps, depending on the scope of that opinion, dispositive of this matter.

wealth was unconstitutional because it had no valid secular purpose. 449 U.S. 39, 42–43, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). The displays recited in small print at the bottom the following: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41, 101 S.Ct. 192. The Supreme Court held that, despite this avowed purpose, the purpose was plainly religious in nature. *Id.* In reaching this conclusion, the Court relied on the fact that the Ten Commandments is "undeniably a sacred text in the Jewish and Christian faiths...." *Id.* The Court indicated that other governmental invocations of the Ten Commandments may pass constitutional muster, but the challenged action made no attempt to mitigate the religious nature of the Ten Commandments. *Id.* at 42, 101 S.Ct. 192 ("This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.... Posting of religious texts on the wall serves no such educational function.") (citation omitted).[5]

Likewise, in a trio of related cases, the Eastern District of Kentucky has recently held that the display of the Ten Commandments on public grounds had no secular purpose and was unconstitutional. *See Doe v. Harlan County Sch. Dist.*, 96 F.Supp.2d 667 (E.D.Ky.2000) (posting in public schools); *ACLU of Ky. v. McCreary County*, 96 F.Supp.2d 679 (E.D.Ky.2000) (posting in courthouse); *ACLU of Ky. v. Pulaski County*, 96 F.Supp.2d 691 (E.D.Ky.2000) (posting in courthouse). In these cases, the defendants claimed that the displays were intended to teach "American religious history and the foundations of the modern state." *McCreary County*, 96 F.Supp.2d at 686. However,

the "narrow scope of the display[s]" belied this stated purpose. *Id.* at 686–87. Moreover, the history of the displays revealed that they originally contained only the Ten Commandments and that only in the face of litigation did the defendants attempt to flank the Commandments with other documents. *Id.* at 687. The Court stated that even if it were to consider these additional documents in construing the purpose of the display, the fact that each had been chosen for its religious references reinforced the court's conclusion that there was no secular purpose. *Id.*

In *Ring v. Grand Forks Public School District Number 1,* the District of North Dakota faced a similar challenge to legislative action requiring the posting of a placard containing the Ten Commandments in a conspicuous place in every classroom in the state. 483 F.Supp. 272, 273 (D.N.D. 1980). Defendants contended that the purpose of the requirement was to "instill in students the basic mores of civilization and the principles of our common law." *Id.* at 274. However, the court held that the posting of the Ten Commandments without any explanation plainly failed to convey that message and thus had no secular purpose. *Id.*

In contrast to these holdings, the Northern District of Indiana recently determined that a monument on the municipal building lawn in the City of Elkhart, Indiana, which structure was identical to the one that formerly stood on the Indiana Statehouse lawn, had a secular purpose. *Books,* 79 F.Supp.2d at 996. The District Court judge was able to glean almost no evidence as to the intent of the city in accepting the display of the Ten Commandments, so it looked to the purpose behind the donation of the monument. *See id.* at 996. Looking only at this stated purpose and referring to the factual findings of the Colorado Supreme Court in

---

**5.** In fact, as we discuss below, Justice Stevens has noted that the south wall of the Supreme Court chambers contains a frieze that includes a depiction of Moses holding the Ten

Commandments that presents no constitutional violation. *County of Allegheny,* 492 U.S. at 652–53, 109 S.Ct. 3086 (Stevens, J., concurring in part and dissenting in part).

*Colorado v. Freedom From Religion Foundation, Inc.*, 898 P.2d 1013 (Colo. 1995), where the intent of an identical donor of an identical monument was construed, the District Judge in *Books* held that the purpose was to "promot[e] morality among [the city's] youth, ... a legitimate aim of government and traditionally part of the police powers of the state." *Books*, 79 F.Supp.2d at 996. In addition, the District Court noted that the donor, the Elkhart chapter of the FOE, was a service organization, not a religious organization. *Id.* at 982. Moreover, at the time of the litigation, the Elkhart Common Council had stated its intention "to maintain a number of exhibits on City property of cultural and historical significance, of which the Ten Commandments monument is just one." *Id.* at 996. Thus, in *Books*, the court concluded that the city had a secular purpose in originally accepting the monument and that its presently stated purpose in displaying it was also secular in nature. *Id.*

In a similar fashion, the Western District of North Carolina held that a display of the Ten Commandments in conjunction with the image of Lady Justice, the sword of justice, and the scales of justice flanked by the United States and North Carolina flags had a secular purpose and was constitutional. *Suhre v. Haywood County*, 55 F.Supp.2d 384, 399 (W.D.N.C.1999). The court looked to the history of the dedication of the monument and found that its intent was to "honor and respect the development of the judicial system." *Id.* at 394. Although the dedication ceremony included the admonition that "[t]his is your Temple of Justice.... Bear in mind at all times that you should be as fair in your dealings with each other as the blind Goddess who stands there, always guided by the Ten Commandments as your code of law ...," *id.* at 387, the court held that the purpose was secular in nature. *Id.* at 394.

■ Turning to the case at bar, we start with the Supreme Court's declaration that the Ten Commandments is undeniably a sacred text. *Stone*, 449 U.S. at 41, 101 S.Ct. 192. With the unambiguous religious nature of the Ten Commandments as our starting point, the County is obligated to articulate a valid secular purpose for the display of this sacred text. *Metzl v. Leininger*, 57 F.3d 618, 622 (7th Cir.1995). The County has articulated that the Monument is to display values common to the community, including both secular and religious values. This purpose is clearly insufficient to satisfy the County's burden; the desire to display religious values is plainly not a valid "secular" purpose.

Our analysis does not end here, however, as a valid secular purpose need not be the exclusive purpose for the display. *Bridenbaugh*, 185 F.3d at 800, 801 (citations omitted). Commissioner Terry (designated a County representative for the purposes of providing a deposition) testified that he believes that the Ten Commandments are connected to and influenced the Bill of Rights (although he acknowledged that there were other legal influences on the Bill of Rights which he could not specifically identify); further, he could not articulate how they are connected. Terry Dep. at 35–36. As we noted in *O'Bannon*, such a link between the religious values contained by the Ten Commandments and the principles embodied by the Bill of Rights is highly dubious, especially in light of the First Amendment's "strong and clear testimony to the fact that, while the framers may very well have known of and been influenced by the Ten Commandments in their personal religious and spiritual lives, such personal religious influences were not allowed to preempt, negate, or otherwise supercede our national preference for secular governmental structures." *Id.* at 852.

While the County wishes to distinguish the purpose espoused by the State in *O'Bannon* which we rejected as being non-secular, there does not appear to be a principled difference between the two enunciated purposes. There, the State argued that the Ten Commandments re-

flected core values and ideals that were presented as secular in nature. *Id.* at 851. However, at oral argument, the State was unable to elucidate or cite any link between most of the commandments and such secular ideals or values. *Id.*

Likewise, Commissioner Terry's deposition testimony attempted to relate values to specific Commandments. Of the several he enunciated (worshiping one God, not praying to the monument, not taking God's name in vain, and resting on the Sabbath) none is secular in nature. Moreover, as we noted in *O'Bannon,* the values of not killing, lying or stealing have at best an attenuated link to secular values. *Id.* at 851 n. 10.

Commissioner Terry further testified that the Monument is on the Courthouse lawn to honor the importance of the limestone industry in the County, but he acknowledged that this reason does not explain why the documents depicted on the Monument were chosen. *Id.* at 873. While honoring the limestone industry is a valid secular purpose, as in *O'Bannon,* the design and content of the Monument indicate that such is not the true purpose for the Monument, but that the purpose is, in fact, religious in nature. *Id.* at 852.

As we noted in *O'Bannon,* the Ten Commandments are not physically or even visually linked to the other texts on the display, appearing by themselves on one side of the large tablet-shaped block. The other three sides of the Monument, respectively, display the texts of other documents and contain the Monument's dedication. No indication appears on the Monument to the effect that the Ten Commandments are displayed for their historical significance, as might arguably be suggested by their visual proximity to several other historical texts or with an explanatory marker.[6] Rather, the Ten Commandments are displayed in such a way that a person looking at them would see only the Ten Commandments, as they are set out on a

seven-foot tall limestone block. These factors reinforce our conclusion that the purpose of displaying the Ten Commandments is religious, not secular, and is thus, in violation of the Establishment Clause. Although this holding would suffice in terms of our First Amendment analysis, we nonetheless will address the second prong of the *Lemon* test as well.

### b. Effect of the Proposed Monument

While the first part of the *Lemon* test focuses on the County's intent, the second prong demands that the challenged action not have the principal or primary effect of advancing religion. *See Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. "Following the Court's formal acceptance [of Justice O'Connor's formulation of the "endorsement test" enunciated in her concurrence in *Lynch v. Donnelly,* 465 U.S. 668, 691, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)] in [*County of Allegheny,* 492 U.S. at 595, 109 S.Ct. 3086], the effect prong of [the *Lemon* test] has been analyzed under the 'perception of endorsement' test developed in [*Lynch*]." *City of Marshfield,* 203 F.3d at 493. Under this test, we must determine " 'whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.' " *Id.* (quoting *Lynch,* 465 U.S. at 691, 104 S.Ct. 1355 (O'Connor, J., concurring)). If we find that a "reasonable person could perceive that a government action conveys the message that religion or a particular religion is favored or preferred, the Establishment Clause has been violated." *City of Marshfield,* 203 F.3d at 493 (citing *Capitol Square Review & Advisory Bd.,* 515 U.S. at 778–79, 115 S.Ct. 2440 (O'Connor, J., concurring)). Although this is a "reasonableness" test, "[e]very government practice must be judged in its unique circumstances to determine" whether it endorses religion. *Lynch,* 465 U.S. at 694, 104 S.Ct. 1355

---

**6.** These are provided only as examples of alternative designs for the Monument. We express no opinion as to whether such de-

pictions would ultimately overcome the decidedly religious purpose in the design of the current Monument.

(O'Connor, J., concurring). Thus, the context of the display, including its message, its presentation, and its surroundings must be factored into our determination.

In *County of Allegheny*, the content and location of the challenged displays assumed key roles in the Supreme Court's resolution of the constitutional issues presented. The Supreme Court reviewed a challenge to a creche displayed inside a county courthouse as well as the constitutionality of a menorah displayed outside the courthouse alongside a Christmas tree and a sign saluting liberty. The Court held that the creche was an unconstitutional endorsement of religion because there was nothing in its content or context that detracted from the religious message it imparted. *See County of Allegheny*, 492 U.S. at 598, 109 S.Ct. 3086. Along with the overtly religious content of the display, the Court noted the importance that:

> the creche sits on the Grand Staircase, the 'main' and 'most beautiful part' of the building that is the seat of county government.... No viewer could reasonably think that it occupies this location without the support and approval of the government. Thus, by permitting the 'display of the creche in this particular setting,' ... the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the creche's religious message.

*Id.* at 599–600, 109 S.Ct. 3086 (internal citation and footnote omitted). Equally important was what the Court *did not* look to in examining the context of the display containing the creche. *See id.* at 598 n. 48, 109 S.Ct. 3086.

> The presence of Santas or other Christmas decorations elsewhere in the county courthouse, and the nearby gallery forum, failed to negate the endorsement effect of the creche. The record demonstrates clearly that the creche, with its floral frame was its own display distinct from other decorations or exhibitions in the building.

*Id.*

In contrast, the Court did declare the display of the menorah to be constitutional. Unlike the creche, the constitutionality of which the Court examined by looking at the display alone, the Court looked at both the menorah and Christmas tree together and determined that the two symbols were not exclusively religious, but represented holidays with both secular and religious dimensions. *See id.* at 613–14, 109 S.Ct. 3086. Thus, there was no endorsement, since "[i]n the shadow of the tree, the menorah is readily understood as simply a recognition that Christmas is not the only traditional way of observing the winter-holiday season." *Id.* at 617, 109 S.Ct. 3086.

The Seventh Circuit likewise has held unconstitutional displays of a nativity scene displayed inside a city hall. *See American Jewish Congress v. City of Chicago*, 827 F.2d 120, 128 (7th Cir.1987). In *American Jewish Congress*, the Seventh Circuit regarded as important the fact that the display was in the city hall, since:

> City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval. The presence of a nativity scene in the lobby, therefore, inevitably creates a clear and strong impression that the local government tacitly endorses Christianity.
>
> The message of endorsement is equally powerful on the symbolic level. Like the nativity scene itself, City Hall is a symbol—a symbol of government power.... A creche in City Hall thus brings together Church and State in a manner that unmistakably suggest their alliance.

*American Jewish Congress*, 827 F.2d at 128.

In another case, when faced with a constitutional challenge to city seals that con-

tained Christian symbols, the Seventh Circuit focused on the powerful relationship between the government and those symbols that represented government power. *Harris v. City of Zion*, 927 F.2d 1401 (7th Cir.1991). In *Harris*, the Seventh Circuit held that a city seal that contained within it the obvious presence of a Latin cross and a city's seal, emblem or logo that contained a Latin cross and the words "God Reigns" had the unconstitutional effect of endorsing religion. *Id.* at 1413, 1415. The court noted that "[l]ike the seat of county government in *County of Allegheny*, or the City Hall Building in *American Jewish Congress*, the corporate seal of a municipality is 'plainly under government control ... (and is) a clear symbol of government power.'" *Id.* at 1412 (quoting *American Jewish Congress*, 827 F.2d at 128). Moreover, the Seventh Circuit noted that the seal presented a "more compelling case for finding the challenged display unconstitutional" due to its status as a permanent fixture as a symbol for the city. *Id.* at 1412. "The City's seal is a permanent statement that is viewed year-round, while the creche is displayed only seasonally amidst the secular celebration of Christmas." *Id.*

The location and context of a display involving the Ten Commandments are just as important as the location and context of displays containing other religious symbols, such as a creche or a Latin Cross. In his concurrence in *County of Allegheny*, Justice Stevens noted that a frieze on the south wall of the Supreme Court chambers included a depiction of Moses holding the Ten Commandments. *County of Allegheny*, 492 U.S. at 652, 109 S.Ct. 3086 (Stevens, J., concurring). He wrote that, standing alone, this image might be seen to convey a message of "respect for Judaism, for religion in general, or for law." *Id.* Such an image standing alone, or alongside images of Confucius and Mohammed, would not be tolerated by the First Amendment. *Id.* However, in the context of a display that depicts images of Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John Marshall

along with these three religious leaders, the overall effect "signals respect not for great proselytizers but for great lawgivers." *Id.* at 652–53, 109 S.Ct. 3086. Thus, the frieze as a whole is a "fitting message [for] a courtroom" and does not violate the First Amendment. *Id.* at 653, 109 S.Ct. 3086.

In *Harvey v. Cobb County*, 811 F.Supp. 669 (N.D.Ga.1993), *aff'd*, 15 F.3d 1097 (11th Cir.1994) (table text), the county sought to place a display containing the Ten Commandments and the Great Commandment in a county courthouse. *Id.* at 671–72. The court, citing *County of Allegheny*, indicated that both the content and context of the display were significant in determining its constitutionality. *Id.* at 677. Relying on *Stone, see supra*, the court readily determined that the display had a religious content. *Id.* (noting that *Stone* considered and rejected the argument that the Ten Commandments is not religious because it can be viewed as a "historical, jurisprudential cornerstone of American legal significance."). Equally significant to the court's holding that the display was unconstitutional was that, unlike the frieze on the wall of the Supreme Court discussed by Justice Stevens in *County of Allegheny*, it sat alone in an alcove in the courthouse without any countervailing secular passages or symbols present. *Id.* at 678.

> Moreover, the display is located in the Cobb County State Court Building, a seat of judicial authority in the county. Although the panel is not located in the most prominent part of the building, it is, nonetheless, located high on the wall, above a marble bench, near the Clerk's Office and the Traffic Court courtrooms. 'No viewer could reasonably think it occupies this location without the support and approval of the government.'

*Id.* (quoting *County of Allegheny*, 492 U.S. at 598, 109 S.Ct. 3086).

In the three cases decided earlier this year by the District Court for the Eastern District of Kentucky, the content and loca-

tion of the displays contributed to the conclusion that they unconstitutionally endorsed religion. As previously described, the displays consisted of the Ten Commandments and other texts chosen solely for their religious references. *McCreary County,* 96 F.Supp.2d at 687. The court held that the displays presented an "overriding theme ... of religion and more specifically of Christianity." *Id.* Moreover, the displays were placed in locations that had unique importance—inside a courthouse and posted on classroom walls. *McCreary County,* 96 F.Supp.2d at 688–89 (courthouse); *Harlan County Sch. Dist.,* 96 F.Supp.2d at 676–77; *Pulaski County,* 96 F.Supp.2d at 700 (courthouse). The court, in *McCreary County,* distinguished the display at issue in that case, located inside of a courthouse, from the displays found constitutional in *Books, Anderson v. Salt Lake City Corp.,* 475 F.2d 29 (10th Cir.1973), and *Suhre,* where the displays were "removed from government buildings" and were "part of some larger artistic rendering or academic display encompassing a wide range of cultural, religious, and legal traditions." *McCreary County,* 96 F.Supp.2d at 689.[7]

In *Freedom From Religion Foundation,* the Supreme Court of Colorado held, in contrast, a display of the Ten Commandments to be constitutional. That display, made of stone and shaped in the form of two tablets, contained a floral design, Phoenician letters that formed no intelligible words, an "all seeing eye," an American eagle grasping an American flag, a version of the Ten Commandments, two stars of David, the two Greek letters, Chi and Rho, one superimposed upon each other, which symbolize the first two letters in the name "Jesus Christ." *See* 898 P.2d at 1016. The Colorado monument was located in a state-owned park on property adja-

cent to, but removed from, the State Capitol building. *See id.* at 1015–16. The court held that the park was "more of a museum setting" and that the Ten Commandments monument itself was one of the "smallest and least conspicuous displays" in the park. *Id.* at 1025. Moreover, the court found significance in the fact that the display, although on public property, was not located "where citizens exercising their right to access the courts or other government benefits might encounter the monument ... [but] in an inconspicuous place where citizens may be found by choice and are not necessarily present for purposes related to government." *Id.* In light of the many countervailing secular symbols surrounding the Ten Commandments on the face of the monument and given its out-of-the-way location, the court held that the monument was not an endorsement of religion. *See id.*

In *Books,* the monument was shaped in the form of two large, stone tablets, and had on its face the same display at issue in *Colorado v. Freedom From Religion Foundation, Inc. Books,* 79 F.Supp.2d at 983. It was located on a grass lawn near the entrance to a municipal building. *See id.* at 984. The court noted that other, historical monuments were maintained by the City, although "none are visible at the same time as the challenged monument," other than a War Memorials monument. *Id.* The court ruled that the content of the monument was not "exclusively religious," given its view that the Ten Commandments hold "both religious and historical significance in this nation." *Id.* at 1002. Despite the proximity of the monument to the entrance to the courthouse, the court held that the monument was not "obtru-

---

**7.** The court also noted that the Tenth Circuit has called into question its holding in *Anderson,* that a Ten Commandments monument identical to the one in *Books* and the one which previously stood on the Indiana Statehouse grounds was constitutional, in light of the Supreme Court's supervening opinion in *Stone. Summum v. Callaghan,* 130

F.3d 906, 910 n. 10 (10th Cir.1997) (decided on freedom of speech grounds). The Eastern District of Kentucky also doubted the validity of the holdings in *Books* and *Anderson,* given *Stone* 's holding that a governmental requirement that the Ten Commandments be displayed in classrooms was unconstitutional. *McCreary County,* 96 F.Supp.2d at 688.

sive" and thus was constitutional in its context. *See id.*

In *Suhre*, the monument in question contained small plaques containing the Ten Commandments, but was "overwhelmingly dominated by Lady Justice and which contain[ed] other secular objects such as the sword of justice and the scales of justice flanked by the American and North Carolina flags." *Suhre*, 55 F.Supp.2d at 395–96. Much like the frieze discussed by Justice Stevens in *County of Allegheny*, given its context, "[t]he display touts nothing more than an effort to recall the origin of modern law, by reference to an ancient source of law and justice. The overall, basic message is equal justice before the law." *Id.* at 397. Thus, although the frieze was located in a courtroom, the court held it not to violate the Establishment Clause. *See id.* at 399.

■ Turning now to the facts of our case, we must determine whether a reasonable person would perceive the Monument located on the Lawrence County Courthouse grounds as conveying a message of government endorsement of religion. *See Lynch*, 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring); *City of Marshfield*, 203 F.3d at 493. We conclude that a reasonable person looking at this Monument would undoubtedly view it as an endorsement of religion.

Looking at the Monument itself, we find no reason to vary from our previous holding in *O'Bannon* that the shape and content of the Monument itself indicates an endorsement of religion. *O'Bannon*, 110 F.Supp.2d at 856–57. As we held in *O'Bannon*, two factors strongly indicate an endorsement of religion. One is that the text of the Ten Commandments is prominently located, to the exclusion of everything else, on one side of this seven-foot tall Monument. The Monument is placed so that the text of the Ten Commandments faces the street and sidewalk. People who approach the Monument from that side will see only that. Not only are people who approach the Monument exposed to this message, but the County admits that

people walking by on the sidewalk will be able to read the text of the Monument. This placement accentuates the likely reach of the message contained on the Ten Commandments side of the Monument beyond that in *O'Bannon* where the State contended that a person would have to stray from either the sidewalk or a pathway and approached the Monument in order to read the text. *Id.* at 857. To understand the link between the Ten Commandments, the Bill of Rights and the "community values" embodied therein, a person would have to walk around the Monument, in a 360–degree fashion, to see the Bill of Rights, the Preamble to the Indiana Constitution, the Ten Commandments and the dedication. As we noted in *O'Bannon*, this is simply not behavior that a reasonable person would likely undertake.

Moreover, even if a person were to review the entire texts on all four sides of the Monument, there is nothing that would allow a reasonable person to put the documents into a secular context. It is undisputed that the engraved letters forming the Ten Commandments are one inch tall and all-capital letters, while the title "Ten Commandments" is in engraved all-capital letters one-and-a-half inches tall, a typeset that no doubt is intended to indicate the importance of the ideals contained therein. In contrast, the size of the lettering of the Bill of Rights is only five-eighths of an inch high and the text of the other documents is even smaller. Looking at these documents together, the Ten Commandments would likely be viewed as most prominent in comparison to the other depictions on the Monument. In addition, no marker identifies any linkage among the documents on the Monument. Reviewing the Monument as a reasonable person would, it is likely that a religious message would be perceived, rather than a secular one.

The County apparently also argues that the proper context by which to evaluate the Monument includes the other markers,

memorials and monuments on the Courthouse lawn. This is an argument we rejected in *O'Bannon,* even though a person viewing the Monument would also have in her line of site one or more of the other memorials on the Statehouse lawn. *Id.* at at 857. In this case, the argument is even less persuasive since it is undisputed that the Monument is the only item on the north side of the County Courthouse lawn. In fact, the County conceded at the hearing that a person looking at the Courthouse from the north would see no other memorial besides the Monument. There is simply no basis for our concluding that this monument is somehow integrated into a larger historical or secular setting as might be found were this a "museum-like setting" where the Monument was integrated with other memorials in close proximity to it.

In addition, the imputed endorsement of religion is enhanced by the location of the Monument at the seat of county governmental power. In *O'Bannon,* we distinguished such a situs from those in cases holding similar displays of religious documents constitutional in "a museum-like setting or in a park." *Id.* at 857 (citing *Freedom From Religion Found.,* 898 P.2d at 1025; *Doe v. Small,* 964 F.2d 611, 619 (7th Cir.1992)). In contrast to those cases, and similar to the displays found unconstitutional in *County of Allegheny, American Jewish Congress, Harris,* and *Harvey* (and by us in *O'Bannon* ), the Lawrence County Monument is located squarely at the heart of governmental power, "an area over which the [County] has exclusive and obvious control." *O'Bannon,* 110 F.Supp.2d at 857. This locus of governmental power places the Monument "well within the boundaries of the property that a reasonable person would associate with the [County Courthouse] itself 'marked with the stamp of government approval ... [and] inevitably creat[ing] a strong impres-

sion that the government tacitly endorses' religion." *Id.* at 858 (quoting *American Jewish Congress,* 827 F.2d at 128).

Finally, as in *O'Bannon,* the perceived permanence of the display enhances the message of endorsing religion. Although Representative Steele originally approached the County with the idea that the placement of the Monument would be temporary during the pendency of the appeal in *O'Bannon,* the Commissioners themselves expect that this Monument may become a permanent item on the Courthouse landscape. Regardless of their intent, however, "everything about its size and construction evinces permanence." *O'Bannon,* 110 F.Supp.2d at 858. This "aura of permanence" strengthens the perception of endorsement perceived by a reasonable person.

Thus, we conclude, as we did in *O'Bannon,* that because of the content and shape of the Monument, its location and its physically imposing stature, a reasonable person would perceive in this display a message of government endorsement of religion, which compels our finding that the Monument once again fails the second prong of the *Lemon* test. Plaintiff Kimbley has thus succeeded in establishing a reasonable likelihood of prevailing on the merits of her First Amendment claim, in that the Monument, according to our preliminary analysis, fails both the first and second prongs of the *Lemon* test, by having a religious purpose and by its implied endorsement of religion. As noted in our opinion in *O'Bannon,* either of these deficiencies suffices to cause a violation of the Establishment Clause.[8]

### 2. *Inadequate remedy at law and irreparable harm*

We have no difficulty concluding that no adequate remedy at law exists for

---

8. Counsel for the County posited that we should reconsider our ruling in *O'Bannon,* follow the Northern District of Indiana's ruling in *Books* and find the Monument to be constitutional. However, we believe that our

analysis in *O'Bannon* was sound and our conclusions correct. The County has provided us with no reason to change this view and we decline to do so.

Kimbley's ongoing First Amendment harm. A First Amendment violation, for even "minimal periods of time," is "unquestionably ... irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality). Thus, these two predicates for injunctive relief are present.

### 3. Balance of harms to the parties and the public interest

■ The County did not articulate in its filings or at oral argument what harm to itself would occur if we required that the Monument be removed pending a final ruling on the merits (and perhaps an appeal). We conclude that the only obvious harm that Defendants might incur would be in being potentially liable for the costs of removing the Monument pending such rulings. This harm inheres to a mandatory injunction (an injunction compelling a defendant to take action). We accept the teachings of our Court of Appeals that such injunctions are cautiously viewed and sparingly used, but that there may be situations justifying such injunctive relief. *Graham v. Med. Mut.*, 130 F.3d 293 (7th Cir.1997); *Jordan v. Wolke*, 593 F.2d 772, 773 (7th Cir.1978) (citing 2 Moores Fed. Pract. ¶ 65.04(1)). We believe this is such an exceptional circumstance.

■ A mandatory injunction can be used to compel the restoration of the status quo. *Texas & N.O.R. Co. v. Northside Belt Ry. Co.*, 276 U.S. 475, 48 S.Ct. 361, 72 L.Ed. 661 (1928). "[W]here a defendant with notice in an injunction proceeding completes the acts sought to be enjoined[,] the court may by mandatory injunction restore the status quo." *Porter v. Lee*, 328 U.S. 246, 251, 66 S.Ct. 1096, 90 L.Ed. 1199 (1946); 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure Civil 2d § 2948 (1995).

■ The status quo need not relate to the period of time when we consider whether to grant an injunction or not, rather it is "the last peaceable uncontested status that existed before the dispute arose." *Mass. Mut. Life Ins. Co. v. Asso-*

*ciated Dry Goods Corp.*, 786 F.Supp. 1403, 1427 (N.D.Ind.1992); Federal Practice and Procedure § 2948. "This standard allows the court to restore the status quo ante when the continuation of the changed situation would inflict irreparable harm on plaintiff." Federal Practice and Procedure § 2948; *see also Ferry–Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir.1984); *Guinness–Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468, 472–73 (2d Cir.1980); *Canal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974).

There is no doubt that the status quo to which Plaintiff may be entitled to return during the pendency of this litigation is the period of time prior to the placement of the Monument on the County Courthouse lawn. The facts clearly establish that Plaintiff filed her suit on October 30, 2000, prior to any affirmative steps being taken by the County to situate the Monument, one day before the base was laid and two days before the Monument itself was erected. One or more of the County Commissioners knew of the filing of this lawsuit prior to the Monument's final placement on the lawn; in fact, Commissioner Chenault testified that she was consulted by County Attorney Smith about the lawsuit and injunction and enlisted by County Engineer Burcham to find a contributor for the cement for the Monument's base prior to its construction. The other two Commissioners acknowledged that they were consulted either about the cement for the base or by County Attorney Smith about the lawsuit prior to November 1, 2000. Despite this advance knowledge, none of them took any steps to insure that the status quo be maintained to allow this court an opportunity to rule on the pending motions. Commissioner Adamson testified that he came to the scene of the Monument's placement on November 1, 2000, prior to its final placement on the cement base, with a full opportunity to stop the County Engineer from undertaking an action he knew, or should have known, was contrary to an equitable maintenance of the status quo. At best, the

Commissioners acted in willful ignorance of their obligations under the laws of Indiana and the United States, through both their actions and their inaction; at worst, they intentionally rushed to create a "new status quo."

Even if the Commissioners personally lacked a full understanding of the import of the request for cement for the base, the filing of the lawsuit including the request for injunctive relief, and the ultimate placement of the Monument, the County has stipulated that Plaintiff provided effective notice to the County of her lawsuit and the request for injunctive relief through her communications with the County Attorney and Mr. Manion. The Commissioners' blindness to their duties and apparent willingness to pursue a course of action with constitutional implications without legal consultation does not compel a contrary conclusion; it would be highly inequitable to allow a governmental body, or any other organization, to flaunt the authority of this court simply by claiming that the right hand did not know what the left hand was doing. Any harm imposed on the County by granting the Plaintiff's requested injunctive relief is therefore self-inflicted.

Compared to the effects of the possible First Amendment violation that will be incurred by the Plaintiff if we fail to enter an injunction, the County's harm is clearly inconsequential. As we have noted above, the harm involved in a constitutional violation is irreparable, even if the condition is allowed to continue to exist for minimal periods. Although the Seventh Circuit Court of Appeals currently has under advisement our prior ruling in *O'Bannon* and the Northern District of Indiana's opinion in *Books*, the resolutions of which promise to significantly impact the resolution of this case, the resultant constitutional harm from allowing the Monument to remain standing greatly outweighs any financial burden imposed upon the County in effecting the Monument's removal. Thus, we conclude that the removal of the Monument and restoration of the status quo ante as it existed prior to the County's imprudent actions to erect the Monument on the County Courthouse lawn is equitable with respect to the interests of the parties, respectively, and fully consonant with the public interest.

*Conclusion*

Having determined that the Plaintiff has a reasonable likelihood of succeeding on the merits of her First Amendment challenge, that she has no adequate remedy at law and would suffer irreparable harm if preliminary relief were to be denied, that the balance of the harms favors the Plaintiff, and that the public interest is in line with granting the Plaintiff her requested injunctive relief, we hold that Plaintiff is entitled to her requested relief. Plaintiff's motion for preliminary injunction is *GRANTED*. Pending a resolution of the merits of this case or until further order of the Court, in our order entered simultaneously with this ruling, we *ENJOIN* the County and *ORDER* the forthwith removal of the Monument containing the Ten Commandments, the Bill of Rights, and the Preamble to the Indiana Constitution from the County Courthouse grounds. The County shall be allowed five business days following the entry of this order to remove said Monument, after which time, a monetary penalty shall be assessed for each day the Monument remains on display on public property, at a rate of $ 1,000 per day as against the County, and against the individual Commissioners and any other individuals determined to be responsible for its removal, at a rate of $ 200 per day, until the Monument is removed and the attorneys have certified such to this court.

Consistent with Federal Rule of Civil Procedure 65(d), this order is binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

**876**

## ORDER GRANTING INJUNCTIVE RELIEF

By our entry of this date, Plaintiff's motions for a temporary restraining order and preliminary injunction are *GRANTED*. Pending a final resolution of the merits of this case or until further order of the Court, we Hereby *ENJOIN* the County and *ORDER* it to remove forthwith from public property the Monument containing the Ten Commandments, the Bill of Rights, and the Preamble to the Indiana Constitution now on display on the County Courthouse grounds. The County is allowed five business days within which to effect the removal of said Monument from the Lawrence County Courthouse grounds, after which time, a monetary penalty shall be assessed for each day the Monument remains on display on County property, at a rate of $1,000 per day as against the County of Lawrence, and against the individual Commissioners and any other individuals determined to be responsible for its removal, at a rate of $200 per day, until the Monument is removed and the attorneys have certified such to this court.

Consistent with Federal Rule of Civil Procedure 65(d), this order is binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise. Defense counsel, Mr. Manion, is specifically ordered and directed to provide a copy of this order to each such County official including but not necessarily limited to each Lawrence County Commissioner, the Lawrence County Engineer, each member of the Lawrence County Council, the County Attorney, the Director of the Lawrence County Highway Department, and also State Representative Steele, within 24 hours of his receipt of same from the Court, and to certify to the Court immediately thereafter the names and addresses of each such recipient and the date of delivery of this order, by listing that information in a filing with the Court. Such notice shall be deemed actual notice to each recipient by personal service.